Azar SAFAIE, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 93–3541.

United States Court of Appeals, Eighth Circuit.

Submitted May 11, 1994.

Decided May 25, 1994.

As Amended on Grant of Clarification July 13, 1994.

Patricia G. Mattos, St. Paul, MN, for petitioner.

Alexander H. Shapiro, Washington, DC (Frank W. Hunger, Mark C. Walters and Alexander H. Shapiro, on the brief), for respondent.

Before McMILLIAN, MAGILL and BEAM, Circuit Judges.

McMILLIAN, Circuit Judge.

Azar Safaie, a citizen of Iran, petitions for review of a final decision of the Immigration and Naturalization Service (INS) denying her requests for asylum and for withholding of deportation under Sections 208 and 243(h) of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1158(a), 1253(h) (1988 & Supp. II 1990). For the reasons discussed below, we affirm.

Safaie arrived in the United States in December 1984 as a nonimmigrant visitor for pleasure and was authorized to remain until April 1985. She stayed beyond that time. In October 1987, the INS ordered Safaie to show cause why she should not be deported. In response, Safaie conceded she was deportable and requested asylum. In her application for asylum, Safaie asserted that were she to be returned to Iran she could be imprisoned and possibly killed for her opposition to the Khomeini regime and to its treatment of women.

At her hearing in May 1988, Safaie, then age 30, testified that she was born in Teheran and that she was discharged from her job as a secretary to an Iranian official in 1981 because she demonstrated her opposition to the government's rules relating to women by refusing to wear traditional clothing. She had refused to give up western dress, makeup, and perfume. After her termination, she enrolled in the University of Teheran, where members of the Revolutionary Guard confronted her over her western clothes and smoking; a member of Hezbollah told her she would be caught alone and punished.

Safaie attended the university between 1981 and 1984, although the university was temporarily closed in 1982. On the day the university was closed, she was detained, along with thousands of other demonstrating students, and was interrogated for almost eight hours; her interrogator threatened to kill her. When the university reopened, she was required to fill out a questionnaire and was interviewed by twenty people about her political views. A month later she was readmitted to the university. She was expelled in

1984 for not accepting Islamic rules and for not attending the funeral of a university official; the deceased was the man who interrogated her for eight hours in 1982. Safaie stated that authorities arrested her for smoking.

Safaie testified she was engaged to an Air Force pilot in the Shah's regime, who met at her house with others to plan a coup d'etat. After the coup plan was discovered, members of the group either were killed or fled the country; her fiancé went to France. Her father, a former diplomat under the Shah, was not part of the plot. She received permission to go to Pakistan after a friend intervened to get her passport back from the authorities who had taken it in 1983, and then she received a tourist visa to visit the United States with her parents. Her parents returned to Iran and had not experienced problems.

Safaie stated that she participated in several demonstrations; that she was a member of a pro-Shah party; and that members of Hezbollah followed her everywhere she went. Safaie stated that she began wearing Islamic dress when it became mandatory in 1982, but she did not have the mentality of a Moslem and members of the Guard told her her dress was not satisfactory. Safaie stated that she had also objected to the lack of freedom in Iran.

Safaie contended that she suffered from post-traumatic stress disorder (PTSD) based on her experiences in Iran. Psychologist Linda Flies Moffat testified that she treated Safaie for PTSD at the Center for Treatment of Torture Victims, beginning in June 1987, when Safaie was experiencing nightmares, anxiety, panic attacks, and mood swings. Moffat stated that Safaie told her about personal threats she received during several detentions, and that Safaie exhibited symptoms consistent with physical torture. On cross-examination, Moffat stated that she could not confirm that Safaie's symptoms resulted from actions by the Iranian government.

The Immigration Judge (IJ) found that Safaie was deportable based on her admission. As to Safaie's request for asylum, the IJ concluded that the evidence fell far short of that required to establish a "well-founded fear" of persecution because her evidence consisted primarily of blanket assertions that she would be arrested, detained, and persecuted for her past criticisms of the Khomeini government. The IJ concluded that her testimony was not consistent or sufficiently detailed to provide a plausible account of the basis for her fear and she provided no corroborative evidence of her claimed activities. The IJ found that Safaie failed to provide any link between her PTSD and any traumatic event that occurred in Iran, and that the incidents that occurred in Iran did not rise to the level or intensity that would cause special notoriety or cause her future persecution. The IJ concluded that her advocacy of women's rights did not per se establish her eligibility for asylum. The IJ noted that Safaie was not forced to leave Iran and that her descriptions of her anti-revolutionary activities were exaggerated and vague. The IJ found that, although her fear of returning to Iran appeared sincere, she failed to establish the statutory eligibility for asylum or withholding of deportation.

Safaie appealed to the Board of Immigration Appeals (Board), which affirmed in a per curiam opinion the denial of her request for asylum and withholding of deportation. The Board adopted the IJ's decision as its own. In a footnote, the Board added, inter alia, that the IJ properly determined that Safaie's detention was an attribute of the Khomeini regime, not persecution within the Act, and that Safaie provided no corroborative evidence of her past persecution for smoking in public or for her western dress. Safaie petitions this court for review.

The Attorney General has discretion to grant asylum to a "refugee." 8 U.S.C. § 1158(a) (1988). A refugee is an alien who is unwilling to return home because of "a well-founded fear of persecution on account of . . . membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To prove a well-founded fear of persecution, an asylum applicant must show that his or her fear is genuine (the subjective component) and that a reasonable person in the same circumstances would fear persecution if returned to the applicant's native country (the objective component). *Wojcik v. INS*, 951 F.2d 172, 173 (8th Cir.

1991) (per curiam); *Kapcia v. INS,* 944 F.2d 702, 706 (10th Cir.1991). This court must uphold the Board's finding that an alien is not a refugee if it is supported by substantial evidence. *Behzadpour v. United States,* 946 F.2d 1351, 1353 (8th Cir.1991).

■ To be eligible for asylum based on membership in a particular social group, an alien must "(1) identify a group that constitutes a 'particular social group' ..., (2) establish that he or she is a member of that group, and (3) show that he or she would be persecuted or has a well-founded fear of persecution based on that membership." *Fatin v. INS,* 12 F.3d 1233, 1240 (3d Cir. 1993).

■ The term, "particular social group," "implies a collection of people closely affiliated with each other, who are actuated by some common impulse or interest." *Sanchez–Trujillo v. INS,* 801 F.2d 1571, 1576 (9th Cir.1986). The principal concern is a "voluntary associational relationship among the purported members, which imparts some common characteristic that is fundamental to their identity as a member of that discrete social group." *Id.* In addition, the "characteristic" includes that which is "essentially beyond the petitioner's power to change" or is so fundamental to the individual's identity or conscience that he or she ought not to be required to change. *Ananeh–Firempong v. INS,* 766 F.2d 621, 626 (1st Cir.1985); *In re Acosta,* 19 I. & N. Dec. 211, 233–34 (1985), *overruled on other grounds, In re Mogharrabi,* 19 I. & N. Dec. 439, 441 (1987). Safaie asserts that Iranian women, by virtue of their innate characteristic (their sex) and the harsh restrictions placed upon them, are a particular social group. We believe this category is overbroad, because no factfinder could reasonably conclude that all Iranian women had a well-founded fear of persecution based solely on their gender. *See Fatin,* 12 F.3d at 1240.

■ Alternatively, Safaie contends that the relevant "particular social group" may be defined as those Iranian women who advocate women's rights or who oppose Iranian customs relating to dress and behavior. We agree with the Third Circuit that a group of women, who refuse to conform and whose opposition is so profound that they would choose to suffer the severe consequences of noncompliance, may well satisfy the definition. *See id.* at 1241. Here, the question is whether Safaie is a member of such a group. The Board's findings that Safaie wore the mandatory garb beginning in 1982, that she was not harmed or mistreated for smoking or wearing makeup, that she did not assert "some missionary fever" to defy the law, and that Safaie would be able to avoid further demonstration of her opposition to the restrictions indicate that her opposition was not of the depth and intensity required. Although Safaie took some affirmative steps to articulate her opposition, we cannot say that for Safaie, compliance with the gender-specific laws would be "so profoundly abhorrent that it could aptly be called persecution." *See id.* at 1242.

■ To prevail on an asylum claim on account of her political opinion based on her public expression of general opposition to the Islamic government, Safaie cannot merely contend that the government's policies are repressive or that she disagrees with the policies; she must demonstrate that she fears particularized persecution directed at her personally on the basis of her political opinion. *See Huaman–Cornelio v. Board of Immigration Appeals,* 979 F.2d 995, 1000 (4th Cir.1992). The Board concluded that, although her subjective fear of persecution was sincere, she had not satisfied the objective element. To reverse the Board's conclusion, the evidence must be "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias,* —— U.S. ——, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992).

■ Generally, brief confinements for political opposition to a totalitarian regime do not necessarily constitute persecution. *See Kapcia v. INS,* 944 F.2d at 708. Several factors, including Safaie's readmission to the university after she was interrogated about her political views, her ability to get a visa to leave Iran, the lack of harm to herself or her family after the coup attempt was discovered, her remaining in Iran after her discharge from the university without incident, and her lack of corroboration of harm, undercut her

claim of a well-founded fear of persecution by the government. *See Rodriguez–Rivera v. United States Dep't of Immigration & Naturalization*, 848 F.2d 998, 1006 (9th Cir.1988) (per curiam). Although she was fired from her job and expelled from the university ostensibly for her political views, Safaie failed to present evidence of a particularized fear or of a situation which shows a risk of danger different than that faced by other citizens in Iran. Thus, the Board's conclusion denying asylum on the basis of political opinion is supported by substantial evidence.

■ The standard for withholding of deportation under 8 U.S.C. § 1253(h)(1) requires the alien to show a "clear probability" that he or she will face persecution. *Behzadpour v. United States*, 946 F.2d at 1354. This standard is more difficult to meet than the "well-founded fear" standard for asylum; thus, having failed to show eligibility for asylum, Safaie also fails to satisfy the eligibility requirement for withholding of deportation. *See id.*

■ Finally, Safaie argues that the Board abused its discretion in adopting as its own the IJ's findings of fact rather than setting forth its reasoning in a separate opinion. It is clear that, in adopting the IJ's opinion as its own, and in supplementing by footnote, the Board conducted de novo review. *See Castillo–Rodriguez v. INS*, 929 F.2d 181, 183 (5th Cir.1991) (Board reviews IJ's decision de novo). We find no abuse of discretion by the Board in not setting forth its own separate opinion.

Accordingly, we affirm the Board's decision.[1]

---

1. After issuance of our original mandate in the present case, Safaie moved for clarification because the parties apparently disagreed over whether the grant of voluntary departure, as contained in the Board's order and affirmed by this court, was to run from June 17, 1994, the date on which we issued our mandate, or retroactively from August 10, 1993, the date of the Board's order. We granted Safaie's motion and withdrew our mandate in order to provide the following clarification. Unless otherwise stated, when this court affirms a decision of the Board, which contains a grant of voluntary departure, we intend and it is implied that voluntary depar-

ture is granted under the same conditions as stated in the Board's decision and that the time allowed for voluntary departure will begin to run on the date upon which our mandate issues. On this question, we agree with the reasoning of the Ninth Circuit in *Contreras–Aragon v. INS*, 852 F.2d 1088, 1092–93 (9th Cir.1988) (en banc). Accordingly, upon reissuance of our mandate in the present case, Safaie shall be permitted to depart from the United States voluntarily within thirty days from the date upon which the mandate issues or any extension beyond that time as may be granted by the district director; and in the event of failure so to depart, Safaie shall be deported as provided in the IJ's order.