In the

# United States Court of Appeals
### For the Seventh Circuit

No. 01-3693

NAZANI YADEGAR-SARGIS,

*Petitioner,*

v.

IMMIGRATION AND NATURALIZATION SERVICE,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A71-849-557

ARGUED JUNE 3, 2002—DECIDED JULY 22, 2002

Before BAUER, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Nazani Yadegar-Sargis, an Iranian, overstayed her visitor's visa, and, consequently, the INS instituted deportation proceedings against her. Ms. Sargis conceded deportability but sought asylum and withholding of deportation. After a hearing, the Immigration Judge ("IJ") issued a ruling in which he denied asylum and withholding of deportation but granted Ms. Sargis voluntary departure. The Board of Immigration Appeals ("BIA" or "Board") affirmed the IJ's decision. Ms. Sargis now seeks further review in this court. For the reasons given in the following opinion, we must deny the petition and affirm the decision of the Board.

# I

# BACKGROUND

## A.

We begin by setting forth the basic facts from the administrative record before us.[1] Ms. Sargis is a seventy-one year

---

[1] During oral argument before this court, counsel for Ms. Sargis recounted additional facts that, upon study of the administrative record, we find not to have been part of the administrative record. For instance, counsel stated that revolutionary guards were stationed not only outside the church, but also inside the church to oversee the services. However, neither Ms. Sargis nor her niece testified that guards were inside the church building. Additionally, counsel stated that guards watched women while in the church to make sure they did not remove their head covering—even momentarily—to receive a blessing from the priest. Again, however, there was no testimony that the guards engaged in such activity. With respect to the rationing of food, counsel stated that Ms. Sargis was forced to go to a mosque to receive her ration coupons. The testimony in the record was that government agents took the coupons at the stores and did not stop store owners from forcing Armenians to the back of the line (and may have done this themselves as well). There is no testimony in the record concerning where Ms. Sargis obtained the ration coupons. Finally, we understood counsel to say that there was a government-sanctioned hierarchy of punishment for failing to adhere to the Islamic dress code: For the first offense, the offender would be spray painted and for the second offense, the offender would be sprayed with acid. The testimony from Ms. Sargis' niece was that "Hezbollah radicals" would administer this punishment indiscriminately; "[s]ometimes it wasn't a paint. Sometimes it was chemical like acid." A.R.51-52.

We do not mean to impugn, in any way, counsel's integrity by pointing out these discrepancies. It may well be that, from sources outside the administrative record, counsel has learned of these facts. Nevertheless, we are bound by the administrative record and cannot consider matters not before the IJ or the BIA. *See Al Najjar v. Ashcroft*,

(continued...)

old native and citizen of Iran. An Armenian Christian, she first began to experience difficulties in Iran when the Ayatollah Khomeini came to power. According to Ms. Sargis, the new government forced her husband to retire from his job solely because he was Armenian. He found another job with a foreign construction company; however, that company eventually shut down. Ms. Sargis testified that her husband was unable to find other work because he was Armenian and Christian. The government, however, did give Ms. Sargis' husband his pension.

At the time that the Ayatollah overthrew the Shah, many Armenian schools were closed. Those that remained open were forced to teach Islam and to accept Moslem students. At that time, Ms. Sargis and her husband sent their only child, a son, to live in Italy where he could study in an Armenian school and would not have to learn the Islamic faith.

After Ms. Sargis and her husband sent their son abroad, government soldiers came to their home in Tehran looking for him. Several times government agents interrogated her and her husband and took her husband to the Komiteh[2] for further questioning. Ms. Sargis believes that these intrusions aggravated her husband's heart condition— a condition of which the agents were aware. Ms. Sargis' husband died from his heart condition in 1988, and the government stopped sending agents to her home after his

---

[1] (...continued)
257 F.3d 1262, 1278 & n.5 (7th Cir. 2001) (stating that the general rule "that the court may not go outside the administrative record" applies to "transitional aliens"—those placed in deportation proceedings before April 1, 1997).

[2] From the record, it appears that the Komiteh is a religious or revolutionary tribunal. *See* A.R.52, 70.

death. After her husband's death, Ms. Sargis did continue to receive his pension.

Ms. Sargis stated that she suffered other hardships because she was Armenian. Specifically, she had difficulty obtaining food. After waiting hours in food rationing lines, she often was forced to the end of the line or told there was nothing for her because she was Armenian. When fellow Armenians objected to this treatment, they were beaten or told to leave the country. Ms. Sargis was forced to change her diet and obtain food through the black market because of these actions.

Ms. Sargis also was forced to wear the Islamic garb. Twice she was approached by the police and was cited for not following the Islamic dress code. Her niece, who lived with Ms. Sargis at the time, was spray painted by Islamic extremists when she went out in public without her scarf to cover her face.[3] Although Ms. Sargis opposed the dress code, after this incident she complied out of fear for her safety.

Ms. Sargis also testified that government agents were stationed at the front gates of her church and hassled young girls and women as they entered church; specifically, they would "complain about your hair or something." A.R.82. When the women came out of church, government agents sometimes would take the women for questioning and "if you have a cross . . . on you, and they'll just grab the cross and throw it or something." *Id.*

After Ms. Sargis' husband died, she left Iran and entered the United States as a visitor for pleasure on August 30,

---

[3]  Ms. Sargis' niece also testified that sometimes women who went out without their faces covered were sprayed with acid and women who wore lipstick often would have their lips rubbed with pieces of glass.

1991. She has remained in the United States since that time and has resided with her niece outside Chicago.

Ms. Sargis' son now lives in Italy. She has one sister and two nieces who reside in Chicago. She no longer has relatives residing in Iran.

## B.

Ms. Sargis was placed in deportation proceedings on July 2, 1993. At the hearing before the IJ, Ms. Sargis and her niece testified to the facts we have set forth. After hearing the testimony and reviewing the submitted documentation, the IJ denied Ms. Sargis' application for asylum.

The IJ characterized Ms. Sargis' claims as based on her religion and her gender:

> The respondent's contention is that she has a gender-based claim, namely, she felt compelled to wear an Islamic or Moslem dress, the hedjab, because she feared the consequences if she did not, that wearing this dress was contrary to her religious beliefs and practices, particularly to her Armenian Christian faith, and as a result of this compulsion by the state and by society she was denied the free practice of her religion.

A.R.34. The IJ further noted that "[t]he respondent in fact did wear the dress. She was never harmed on any occasion because of what she wore. She was never arrested or imprisoned or even harassed by non-governmental authorities at any time. She did attend church." *Id.* at 35. Consequently, the IJ concluded that Ms. Sargis' experiences did not rise to the level of persecution. The IJ, however, did grant Ms. Sargis voluntary departure.

The BIA affirmed the IJ's opinion in its entirety. The BIA characterized Ms. Sargis' claim as persecution "by funda-

mentalist Muslims in Iran due to her religious beliefs as a Christian Armenian, and due to her refusal to comply with the traditional Muslim dress code." A.R.2. The BIA first evaluated Ms. Sargis' claims of past persecution. The BIA characterized persecution as an "extreme concept" and stated that Ms. Sargis' experiences in Iran did not rise to this level. *Id.* at 3. In making its determination, the BIA acknowledged that Ms. Sargis had been forced to wear the Muslim garb for fear of being attacked, that she had suffered discrimination with respect to food rationing because she was Armenian, and that her son was forced to go abroad to study his native language and culture. Although "deplorable," these incidents constituted harassment, not persecution. *Id.*

The BIA also found that Ms. Sargis had not established a well-founded fear of future persecution. Again, the BIA acknowledged harassment and discrimination by the Iranian government against Christians, but held that it did not rise to the level of persecution. The BIA similarly rejected Ms. Sargis' argument that she would suffer persecution on account of her membership in a social group "consisting of Christian women who fear the threat of persecution for failing to conform to the dress code imposed by Islamic laws." *Id.* The BIA acknowledged that the women who shared this plight may qualify as a particular social group for the purposes of asylum law:

> To the degree that the respondent and other women in her proposed group oppose the dress code because they feel it is an imposition of the Islamic religion on them, we would find the members of this group should not be required to change their opposition because it is fundamental to their individual identities or consciences.

*Id.* The BIA nevertheless rejected Ms. Sargis' argument that she would suffer persecution because of her membership in this group:

[W]e note that the respondent always complied with the dress code while living in Iran, and she has indicated that, if returned to Iran, she would continue to conform to the dress code. Despite the Islamic dress code, the respondent continued to practice her Christian religion in Iran. The respondent has not testified that she will willingly oppose the Islamic law by refusing to wear the required clothing. Thus, we do not accept that the respondent's actions reflect that her opposition to the Islamic law is fundamental to her individual identity or conscience. Therefore, the respondent has not established her membership in the particular social group.

*Id.* Ms. Sargis timely sought relief from this court.

## II

## DISCUSSION

### A.

"Asylum eligibility 'is a factual determination which we review under the substantial evidence test.'" *Petrovic v. INS*, 198 F.3d 1034, 1037 (7th Cir. 2000) (quoting *Sivaainkaran v. INS*, 972 F.2d 161, 163 (7th Cir. 1992)). "We shall disturb the BIA's findings 'only if the record lacks substantial evidence to support its factual conclusions.'" *Ambati v. Reno*, 233 F.3d 1054, 1059 (7th Cir. 2000) (quoting *Malek v. INS*, 198 F.3d 1016, 1021 (7th Cir. 2000)). This court may not reverse the BIA's determination simply because it would have decided the case differently. *See Anton v. INS*, 50 F.3d 469, 472 (7th Cir. 1995).

Congress has given the Attorney General discretion to grant asylum if an applicant qualifies as a refugee under 8 U.S.C. § 1101(a)(42)(A). The Immigration and Nationality Act ("INA") defines "refugee" as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A).

In order to qualify as a refugee, the asylum applicant must establish that he has a well-founded fear of future persecution based on one of the statutorily protected categories. An alien may establish fear of future persecution in one of two ways. *See Marquez v. INS*, 105 F.3d 374, 379 (7th Cir. 1997). First, he may establish that he endured past persecution. *See id.* If he meets this requirement, there is a rebuttable presumption that he has a well-founded fear of future persecution and therefore should be granted asylum. *See Asani v. INS*, 154 F.3d 719, 722 (7th Cir. 1998). Alternatively, the asylum applicant may come forward with evidence that he will endure persecution if returned to his country of origin. *See Marquez*, 105 F.3d at 379.

### B.

We first address whether the record supports the determination that Ms. Sargis has failed to establish that she has suffered past persecution on account of her Armenian ethnicity and her religious affiliation.

In this regard, Ms. Sargis points to the fact that, when she lived in Iran, she was forced to the end of food rationing lines, that guards were posted at her church and harassed women as they came in (and took some for questioning when they departed) and that she was forced, under threat of imprisonment or bodily harm, to wear the Islamic garb.

Although "persecution encompasses more than threats to life or freedom," *Tamas-Mercea v. Reno*, 222 F.3d 417, 424 (7th Cir. 2000), such actions must "rise above the level of mere 'harassment' to constitute persecution," *Sofinet v. INS*, 196 F.3d 742, 746 (7th Cir. 1999). "Types of actions that might cross the line from harassment to persecution include: 'detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture.' " *Begzatowski v. INS*, 278 F.3d 665, 669 (7th Cir. 2002) (quoting *Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir. 1995)).

Ms. Sargis undoubtedly has endured harassment and hardship in Iran on the basis of her ethnicity and religious affiliation. She has been confronted by police because her dress did not conform to the requirements imposed by the dominant religion, interrogated concerning her son and forced to the end of rationing lines. However, Ms. Sargis never was detained; she was not physically assaulted; she did not suffer extreme economic deprivation; nor was she the direct subject of a physical threat. We must conclude that, under our precedent, the evidence of record does not compel a finding of persecution. *See Begzatowski*, 278 F.3d at 670 (holding that being repeatedly forced into life-threatening situations constituted persecution); *Asani*, 154 F.3d at 725 (stating that "it is likely that the events described by Asani—being beaten resulting in the loss of two teeth, deprived of food and water, detained in a cell with no room to sit, and chained to a radiator—are sufficiently serious to rise beyond the level of mere harassment").[4]

---

[4] Ms. Sargis seems to fault the BIA for failing to consider the subjective component of establishing a well-founded fear of persecution and failing to balance the subjective and objective components

(continued...)

## C.

Ms. Sargis also submits that the BIA erred in determining that she did not have a well-founded fear of persecution based on her membership in a particular social group— Christian women who oppose wearing the Islamic garb. She asserts that, if returned to Iran, she will suffer persecution on the basis of her membership in this group.

This court has held that "[t]o qualify for asylum based on group membership, an alien must: 1) identify a particular social group; 2) establish that she is a member of that group; and, 3) establish that her well-founded fear of persecution is based on her membership in that group." *Sharif v. INS*, 87 F.3d 932, 936 (7th Cir. 1996). The common characteristic that defines the social group "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998) (internal quotation marks and citations omitted).

Evaluating the evidence according to the standards set forth above, Ms. Sargis' first burden is to identify a particu-

---

[4] (...continued) of that requirement. This court has stated: "To establish a well-founded fear of persecution, an applicant must show both that he genuinely fears being persecuted and that his fear is objectively reasonable." *Bereza v. INS*, 115 F.3d 468, 472 (7th Cir. 1997) (citations omitted). Neither the IJ nor the BIA doubted the veracity of Ms. Sargis' statements or the basis for her fears; instead, both the IJ and the BIA focused on the nature of the actions that caused her fear and determined that those actions did not constitute persecution under the statute. The fact that the IJ and the BIA failed to dwell on the subjective component—after finding that the objective component was not met—was not error.

lar social group. With respect to this element, we believe that Ms. Sargis has met her burden. Ms. Sargis identified in her brief the group of Christian women in Iran who do not wish to adhere to the Islamic female dress code. This group is virtually indistinguishable from social groups recognized by other circuits. *See Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993); *Safaie v. INS*, 25 F.3d 636 (8th Cir. 1994).[5]

---

[5] In *Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993), the petitioner had left Iran prior to the Shah's downfall in 1978. She overstayed her student visa, and the INS began deportation proceedings. In those proceedings, Fatin claimed that she was entitled to asylum because she would be persecuted upon her return to Iran on the basis of her membership in the social group of "Iranian women who refuse to conform to the government's gender specific laws and social norms." *Fatin*, 12 F.3d at 1241. The court determined that the "particular social group" limited in this way,

> may well satisfy the BIA's definition of that concept, for if a woman's opposition to the Iranian laws in question is so profound that she would choose to suffer the severe consequences of noncompliance, her beliefs may well be characterized as so fundamental to [her] identity or conscience that [they] ought not be required to be changed.

*Id.* (quoting *Matter of Acosta*, 19 I&N Dec. 211, 234 (BIA 1985)). However, the Third Circuit found that Fatin did not fall within the social group she had defined. Fatin had based her claim primarily on the Islamic dress requirements. "[B]ut," continued the court, "the most that the petitioner's testimony showed was that she would find that requirement objectionable and would seek to avoid compliance if possible." *Id.* Fatin never testified that she would refuse to comply with the requirements or that wearing the chador was "so deeply abhorrent to her that it would be tantamount to persecution"; she testified "only that she 'would try to avoid' wearing a chador as much as she could." *Id.* The court concluded that "[t]his testimony does not bring her within the particular social group that she has defined—Iranian women who refuse to conform with those requirements even if the consequences may be severe." *Id.*

(continued...)

[5] (...continued)

The Third Circuit also considered whether Fatin's testimony placed her within another "particular social group"—"consisting of Iranian women who find their country's gender-specific laws offensive and do not wish to comply with them"—for which she would be persecuted if she returned to Iran. *Id.* The Third Circuit determined, however, that even if the group was broadened in this way, Fatin still could not meet the requirements for asylum because she could not show that "the consequences that would befall her as a member of that group would constitute 'persecution.'" *Id.* at 1241-42. The court explained that Fatin "would have two options if she returned to Iran: comply with the Iranian laws or suffer severe consequences." *Id.* at 1242. The court agreed that the consequences of noncompliance would constitute persecution; however, it also had to consider whether the alternative "—compliance—would also constitute persecution." *Id.* In considering this option, the Third Circuit accepted the fact that persecution could "include governmental measures that compel an individual to engage in conduct that is not physically painful or harmful but is abhorrent to that individual's deepest beliefs," such as forcing an individual to renounce her religious beliefs or to desecrate an important religious object. *Id.* These government actions, the court stated, would constitute torture only "if directed against a person who actually possessed the religious beliefs or attached religious importance to the object in question." *Id.* The evidence, however, established that, although Fatin found the clothing requirements objectionable, they were not "so profoundly abhorrent [to her] that [they] could aptly be called persecution." *Id.* Consequently, the court determined that the petitioner did not qualify for asylum based on her membership in a social group.

The Eighth Circuit reached a similar conclusion in *Safaie v. INS*, 25 F.3d 636 (8th Cir. 1994). In that case, the petitioner asserted that she was entitled to asylum on the basis of her belonging to the particular social group "defined as those Iranian women who advocate women's rights or who oppose Iranian customs relating to dress and behavior." *Id.* at 640. Following the Third Circuit, the court acknowledged that a group of women "who refuse to conform and

(continued...)

Ms. Sargis also meets the second requirement—she falls within this particular social group.[6] Furthermore, the consequences of failing to comply with the dress code—beatings, imprisonment, and being physically abused (such as having your lips rubbed with glass) clearly constitute persecution under the INA.

Nevertheless, we cannot say that the record before us conclusively establishes that Ms. Sargis has been persecuted on the basis of her inclusion within this group; certainly, the determination of the Board to the contrary cannot be characterized as unsupported by the record. In order for Ms. Sargis to qualify as a refugee, she also has to establish

---

[5] (...continued)
whose opposition is so profound that they would choose to suffer the severe consequences of noncompliance" would fit the definition of a particular social group. *Id.* However, the court ultimately rejected the asylum claim because, although the petitioner had taken "some affirmative steps to articulate her opposition," the court could not say that requiring the petitioner to comply with the "gender-specific laws would be so profoundly abhorrent that it could aptly be called persecution." *Id.* (internal quotation marks and citations omitted).

The language employed by our colleagues in the other circuits, although perhaps quite appropriate for the fact situations before them, raises a significant ambiguity when taken out of its immediate context. Although it would seem appropriate to require that the government-imposed requirement be one that affects a deeply held belief, it is unclear to us why the victims must be willing to suffer whatever consequence may be visited on them as a prerequisite to claiming persecution. The law does not impose an absolute requirement that one be willing to suffer martyrdom to be eligible for asylum.

[6] Ms. Sargis would not fall within the narrower category of women who refuse to wear the Islamic garb; she has complied with this requirement and has indicated that she will continue to comply with this requirement if returned to Iran.

that complying with the dress code would, for her, rise to the level of persecution. *See Fatin*, 12 F.3d at 1242. When asked whether she objected to wearing the Islamic dress, Ms. Sargis replied that "[t]his is not our Armenian culture, its not our dress. We don't . . . we don't dress this kind of things." A.R.83. When asked whether she considered it a religious practice, she responded that "[w]hen they want us to wear the same thing that . . . as the religion wants . . . wants them to do, it's kind of forcing you to accept their religious . . . ." *Id.* Finally, in response to the question from her counsel whether she felt "that the dress code infringed on [her] religious practice?" A.R.85, Ms. Sargis responded, "Yes, its against my religion. I think that they tried slowly to take . . . to change us into Islam religion." *Id.* at 86. However, Ms. Sargis also testified that she complied with the dress code, *id.* at 91, and, because of her compliance, she was not stopped from attending church, *id.*

We do not believe that Ms. Sargis' testimony compelled a finding by the Board that complying with the Islamic dress requirements would constitute persecution for her. First, when asked why she objected to the dress, her first response was that it was not her culture. Second, although she testified that she believed that the dress code was a way to force Christians to conform to Islam, she did not testify that it violated a specific tenet of her faith. Finally, Ms. Sargis had complied with the dress code while she lived in Iran and, as long as she did so, was not prevented from attending church and practicing her faith. Consequently, because the evidence could be interpreted such that the dress requirements are not "abhorrent to [Ms. Sargis'] deepest beliefs," *Fatin*, 12 F.3d at 1242, we cannot say that the BIA's determination to deny asylum on this basis is without support in the record.

We faced a similar, although not identical, claim of persecution based on social group membership in *Sharif*,

87 F.3d 932. In *Sharif*, the petitioner claimed that she would be persecuted upon her return to Iran on the basis of her status as a "westernized woman." *Id.* at 934. We accepted for the sake of argument that "westernized women" constituted a cognizable social group. However, the court determined that

> Sharif is still unable to demonstrate a reasonable fear of persecution because of her membership in that group. There is no evidence to suggest that Sharif is either unable or unwilling to comply with Iranian law when she returns to Iran. Sharif has no history of objecting to Iran's social code. Nor is there any evidence to suggest that Sharif will voice her opposition to Iranian law when she returns.

*Id.* at 936. The court therefore concluded that "Sharif's inability to enjoy the freedoms enjoyed by American women does not equate with a threat of affirmative persecution by the Iranian regime based on Sharif's 'pro-western views.' " *Id.*[7]

---

[7] In a slightly different context, an en banc Ninth Circuit reached a similar conclusion. In *Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996) (en banc), a native and citizen of Iran claimed that, if she were returned to Iran, she would suffer persecution on account of her political beliefs—specifically her opposition to the Islamic dress code for women. The Ninth Circuit rejected this claim because Fisher could not establish that the Iranian government's " 'potential act of persecution stemmed from its desire to single [her] out for unique punishment because of [her] actually-held or perceived-to-be-held political or religious beliefs.' " *Id.* at 962 (quoting *Abedini v. INS*, 971 F.2d 188, 192 n.1 (9th Cir. 1992)). According to the court,

> Fisher failed to show that Iran punished her because of her religious or political beliefs, or that, if she returned to Iran, she would violate the regulations because of her beliefs, thereby
> (continued...)

## D.

We are constrained to point out an additional matter that immigration authorities ought to consider before deporting Ms. Sargis to Iran. We take note of the very significant delay that this case experienced during the administrative process. Deportation proceedings first were instituted against Ms. Sargis in 1993. Today, almost a decade later, at the age of seventy-one, she faces deportation to a country in which, according to the record, she has no close relatives. Although we are bound by the record to sustain the Board's determination that Ms. Sargis will not be subject to persecution on the basis of her religion or social group, the practical reality is that, given her age and her attempt to remain in the United States, she cannot expect a warm welcome or a very easy life. In fact she probably can expect, given her age, a very hard life. Inasmuch as the difficulties that she prob-

---

[7]  (...continued)
> triggering government action. No evidence suggests that Fisher ever spoke out against the government's political or religious practices or even publicly articulated any political or religious opinions. Although she stated that she is against the Khomeini regime and disagrees with its theory of Islam, she introduced no evidence suggesting that the three incidents she described were related to these beliefs.
>
> There also is no evidence suggesting that if she returned to Iran, Fisher would not conform with the regulations. Indeed, she testified that the veil incident occurred because she *mistakenly* left several strands of hair outside her veil, not because she intended to make a political or religious statement.

*Id.* at 962-63 (internal quotation marks and citations omitted). Consequently, because Fisher's compliance with the dress code did not implicate a fundamental belief and because Fisher had complied with the code in the past, compliance did not rise to the level of persecution.

ably will endure are age-related, the INS must bear significant responsibility for the situation. To the extent that there exist further steps that may permit this applicant to avoid these difficulties, it is, we respectfully suggest, the responsibility of immigration officials to give them very serious consideration.

## Conclusion

For the reasons set forth in this opinion, we must deny the petition for review and affirm the decision of the Board.

AFFIRMED

A true Copy:

      Teste:

                                  _____
                                  *Clerk of the United States Court of*
                                  *Appeals for the Seventh Circuit*