**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1180
_____

MARTHA ELENA CHAVEZ-CHILEL,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

_____

On Petition for Review of a Decision of
the Board of Immigration Appeals
(Agency No. A208-196-682)
Immigration Judge: Steven A. Morley
_____

Submitted under Third Circuit L.A.R. 34.1(a)
December 6, 2021
_____

Before: SHWARTZ, PORTER, and FISHER, <u>Circuit Judges</u>.

(Filed: December 9, 2021)

Theodore J. Murphy
Murphy Law Firm
320 North High Street
West Chester, PA 19380

    Counsel for Petitioner


Brian Boynton
Acting Assistant Attorney General
Sheri R. Glaser
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

    Counsel for Respondent

———————

OPINION

———————


SHWARTZ, Circuit Judge.

  Martha Elena Chavez-Chilel petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the order of the Immigration Judge ("IJ") denying her applications for asylum and withholding of removal. Because (1) the Department of Homeland Security's ("DHS")

2

failure to include the date and time of her hearing in its Notice to Appear ("NTA") does not require termination of her immigration proceedings, and (2) substantial evidence supported the BIA's conclusion that "Guatemalan women" is not a particular social group ("PSG") for asylum or withholding purposes, we will deny the petition.

I

Chavez-Chilel, a native and citizen of Guatemala, entered the United States without admission or parole. DHS issued her an NTA before an IJ, "on a date to be set at a time to be set," charging her with removability pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). A.R. 444–45. She was subsequently served a Notice of Hearing that specified the date and time to appear.

Before the IJ, Chavez-Chilel admitted the factual allegations in the NTA and conceded removability as charged. She then filed applications for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT"). With respect to her claims for asylum and withholding of removal, she asserted that she would be subject to persecution because she is a member of a PSG: "Guatemalan women." A.R. 202.

Chavez-Chilel moved to terminate her removal proceedings, arguing that the NTA was defective under Pereira v. Sessions, 138 S. Ct. 2105, 2114–15 (2018). The IJ denied the motion, reasoning that (1) Pereira concerned only

3

cancellation of removal and its stop-time rule,[1] not asylum or withholding of removal, (2) Chavez-Chilel suffered no prejudice from any deficiency in the NTA, and (3) a deficient NTA does not divest the IJ of jurisdiction.

At her merits hearing, Chavez-Chilel testified that she was raped as a teenager in Guatemala, the police did not take any action when she reported this crime, and the same man later threatened to rape her again. She explained that she feared she would be sexually assaulted or killed if she was removed to Guatemala. The IJ denied Chavez-Chilel's applications for asylum and withholding of removal,[2] finding that, while she was credible and that her rape qualified as past persecution, her proposed PSG, "Guatemalan women," did not constitute a PSG for asylum or withholding of removal purposes. The IJ concluded that this PSG was not "sufficiently particular" because there was no evidence that Guatemalan women share a "unifying characteristic" or present a "unified target" for persecution. A.R. 98. Chavez-Chilel appealed to the BIA.

The BIA dismissed the appeal and affirmed, reasoning that: (1) the NTA and subsequent Notice of Hearing vested the IJ with jurisdiction, so terminating and re-initiating the

---

[1] The stop-time rule, relevant only to applications for cancellation of removal, provides that a noncitizen's "period of continuous physical presence is 'deemed to end . . . when the [noncitizen] is served a[n NTA] under section 1229(a).'" Pereira, 138 S. Ct. at 2109 (quoting 8 U.S.C. § 1229b(d)(1)(A)).

[2] However, the IJ granted Chavez-Chilel's application for CAT protection. The Government did not appeal this decision to the BIA.

4

removal proceedings was not warranted, and (2) Chavez-Chilel's proposed PSG was "too broad to be cognizable." A.R. 4.

Chavez-Chilel petitions for review.

II[3]

A

The BIA and IJ properly denied Chavez-Chilel's motion to terminate removal proceedings even though her NTA lacked a specific date and time to appear. Title 8 U.S.C. § 1229(a) requires that an NTA include, among other things, the "time and place at which the proceedings will be held." 8 U.S.C. § 1229(a)(1)(G)(i). Chavez-Chilel argues that DHS's failure to comply with § 1229(a) constitutes a statutory violation, which itself requires terminating the proceedings. This argument fails for several reasons.

First, while § 1229(a) sets forth the type of notice that must be given to a noncitizen and requires an NTA to include a date and time to appear, the absence of that information does

---

[3] The BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3), and we have jurisdiction over final orders of the BIA under 8 U.S.C. § 1252(a)(1). Garcia v. Att'y Gen., 665 F.3d 496, 502 n.4 (3d Cir. 2011). We review legal determinations de novo and "accept factual findings if supported by substantial evidence," meaning we must "uphold the agency's determination unless the evidence would compel any reasonable fact finder to reach a contrary result." Sesay v. Att'y Gen., 787 F.3d 215, 220 (3d Cir. 2015) (citation omitted).

not impact the IJ's authority to act.  See Nkomo v. Att'y Gen., 930 F.3d 129, 133 (3d Cir. 2019); see also United States v. Cortez, 930 F.3d 350, 364 (4th Cir. 2019) (observing that the information that must be provided to a noncitizen under § 1229 differs from what must be provided to an IJ for it to act).  An IJ can act when a charging document, such as an NTA, is filed.  See 8 C.F.R. § 1003.14 ("Jurisdiction vests, and proceedings before an [IJ] commence, when a charging document is filed with the Immigration Court by [DHS].").  Thus, noncompliance with the language of § 1229 alone does not require an IJ to terminate the proceedings.

Second, even if Chavez-Chilel's NTA did not comport with the "letter" of § 1229, that statute is akin to a claims-processing rule.  Perez-Sanchez v. Att'y Gen., 935 F.3d 1148, 1153–57 (11th Cir. 2019).  Claims-processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 435 (2011).  They differ from jurisdictional rules, which "govern[] a court's adjudicatory capacity," namely "its subject-matter or personal jurisdiction."  Id.  Said differently, jurisdictional rules typically act as "external constraints" on an entity, whereas claims-processing rules are "internal rules" that help to maintain order but do not "define the scope of [the entity's] power."  Cortez, 930 F.3d at 360–61 (citations omitted).[4]

---

[4] Chavez-Chilel asserts that § 1003.18(b) contradicts § 1229 and is thus arguably claiming that the regulation is entitled to no Chevron deference.  There are no Circuit rulings currently holding that the regulation violates Chevron, see, e.g., Lopez v. Barr, 925 F.3d 396, 401 (9th Cir. 2019),

6

but at least one has viewed the Attorney General as "exercising congressionally delegated authority" when he "promulgated regulations governing the initiation of removal proceedings." Cortez, 930 F.3d at 358 (citing 8 U.S.C. § 1103(g)(2)). We do not need to address this argument because Chavez-Chilel's petition is based upon her view that a violation of the statue alone entitles her to relief. We nonetheless note that the relevant regulations further the processing of a claim. For example, the Attorney General has issued regulations setting forth the requirements for charging documents, such as NTAs. For instance, 8 C.F.R. § 1003.15 provides that a charging document must include the nature of the proceedings, the legal authority under which the proceedings are being conducted, the acts alleged to violate the law, the statutes allegedly violated, the fact that the noncitizen may have counsel appear on her behalf, the address of the IJ where the NTA is to be filed, and notice to the noncitizen concerning in absentia removal. 8 C.F.R. § 1003.15(b); see also Pierre-Paul v. Barr, 930 F.3d 684, 690 (5th Cir. 2019) (stating that "proceedings before an [IJ] commence when a charging document is filed. To constitute a valid charging document, the regulations require that a notice to appear list the nature of the proceedings, the legal authority for the proceedings, and the warning about the possibility of in absentia removal[.]"), abrogated in part on other grounds by Niz-Chavez v. Garland, 141 S. Ct. 1474, 1479–80 (2021)). A different regulation provides that an NTA need only include the date and time of the initial hearing "where practicable." 8 C.F.R. § 1003.18(b). As there was no showing that providing a date and time in the NTA at the time it was issued to Chavez-Chilel was practicable, the NTA here contained all

7

Section 1229 is a claims-processing rule because it seeks to ensure that noncitizens appear for proceedings by requiring that the noncitizen be informed of the time and place of the hearing.  By providing that information, the agency can set a schedule for moving the case forward.  When there is a violation of a claims processing rule, as compared with a jurisdictional rule, the adjudicator has the authority to determine how to address the noncompliance.  Cf. Gutierrez v. Johnson & Johnson, 523 F.3d 187, 197 (3d Cir. 2008) ("The import of th[e] distinction between jurisdictional and [claims-processing] rules . . . is that courts cannot create equitable exceptions to jurisdictional [rules].").  Thus, because there can be equitable reasons to excuse noncompliance with a claims-processing rule, see id. at 197–98 (explaining that where there is a violation of a "claims-processing rule . . . a court can exercise its discretion and hear an untimely appeal"), there is no automatic requirement that a violation of a claims-processing rule results in the termination of a proceeding.[5]

---

of the required components.  Thus, the NTA complied with the regulations.

[5] Several of our sister Circuits have described the regulations relevant here as claims-processing rules and some have viewed compliance with certain claims-processing rules as mandatory.  See Martinez-Perez v. Barr, 947 F.3d 1273, 1278–79 (10th Cir. 2020) (observing that a "claim-processing rule is mandatory to the extent a court must enforce the rule if a party properly raises it," and suggesting no prejudice analysis is required); Perez-Sanchez, 935 F.3d at 1153–57 (treating the statute and regulations as claim-processing rules but not addressing whether failure to comply with the statute required a remand due to petitioner's failure to exhaust that argument

Third, even if the NTA's omission of a date and place did not comply with the statute, the omission was harmless. "[H]armless error analysis . . . appl[ies] in immigration cases," and an error is harmless "when it is highly probable that [it] did not affect the outcome of the case." Li Hua Yuan v. Att'y Gen., 642 F.3d 420, 427 (3d Cir. 2011); see also Guadalupe v. Att'y Gen., 951 F.3d 161, 167 (3d Cir. 2020) (concluding error in petitioner's NTA was not harmless); see also Matter of Rosales Vargas, 27 I. & N. Dec. 745, 753 (B.I.A. 2020) ("While the respondents in this case timely challenged the deficiencies in their [NTAs], there is no apparent prejudice."). The purpose of an NTA is to notify a noncitizen that she is removable and provide the basis for that allegation. The NTA here provided such notice, and the subsequent Notice of Hearing provided the date and time of the hearing. The lack of a date and time for a hearing on the NTA did not impede Chavez-Chilel's opportunity to contest the charge against her, present evidence, and receive CAT relief. Accordingly, DHS's failure to include the date and time for her hearing on the NTA itself was

---

before the BIA); Pierre-Paul, 930 F.3d at 691–93 (noting that "[a] claim-processing rule is mandatory to the extent a court must enforce the rule if a party properly raises it," but determining petitioner failed to timely raise his objection to the NTA); Cortez, 930 F.3d at 359–62; Ortiz-Santiago v. Barr, 924 F.3d 956, 962–66 (7th Cir. 2019). Given the purpose of the claims-processing rule before us, namely to ensure the proceedings move forward and that the noncitizen have an opportunity to participate, equitable considerations inform whether technical noncompliance requires particular relief.

9

harmless error, and thus a remand to direct the termination of the proceeding, or to re-initiate it, is unwarranted.[6]

For all of these reasons, the violation of § 1229 did not require the IJ to terminate the proceedings.[7]

---

[6] To the extent Chavez-Chilel bases any of her arguments on <u>Pereira</u>, that case is inapposite because it governs only a specific aspect of cancellation of removal relief—the stop-time rule—and Chavez-Chilel is not seeking that type of relief. <u>See</u> 138 S. Ct. at 2114–15; <u>Nkomo</u>, 930 F.3d at 133 (explaining that <u>Pereira</u> "did not purport to resolve issues beyond the . . . stop-time rule context, and the Supreme Court repeatedly emphasized the narrowness of its holding").

[7] None of the three cases Chavez-Chilel identified in her Rule 28(j) letters changes the result. <u>Rodriguez v. Garland</u>, 15 F.4th 351 (5th Cir. 2021), addresses in absentia removal orders, which are not at issue here. In any event, the in absentia provision specifically refers to § 1229(a), <u>see</u> 8 U.S.C. § 1229a(b)(5)(C)(ii) (explaining that an in absentia removal order may be rescinded "upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with [§ 1229(a)]"), and thus "require[s] a single document containing the required information[, including the date and time of the hearing,] in the in absentia context," 15 F.4th at 355. By contrast, "the jurisdiction-vesting regulation[] d[oes] not cross-reference 8 U.S.C. § 1229(a)." <u>Mejia Romero v. Att'y Gen.</u>, 997 F.3d 145, 148 (3d Cir. 2021). <u>Rodriguez</u> does not, therefore, affect our conclusion that § 1229(a) is not jurisdictional. Thus, <u>Rodriguez</u> has no bearing on this case, the IJ's jurisdiction, or Chavez-Chilel's statutory argument.

De La Rosa v. Garland, 2 F.4th 685 (7th Cir. 2021), also does not change our analysis.  De La Rosa held that § 1229(a) is a mandatory claims-processing rule, and so "[a] noncitizen who raises a timely objection to a noncompliant [NTA] . . . is entitled to relief without also having to show prejudice from the defect."  Id. at 688.  Even if we were to adopt De La Rosa, including its view that § 1229(a) is a mandatory claims-processing rule, it would not provide Chavez-Chilel a basis for relief.  De La Rosa directs that an objection to the contents of an NTA should "be[] lodged at the outset of the proceeding."  Id.; see also Chen v. Barr, 960 F.3d 448, 451 (7th Cir. 2020) (observing that "[a] problem in the charging document could and should have been pointed out promptly, so that any error could be fixed.").  According to De La Rosa, absent a timely objection, the petitioner must show "excusable untimeliness and . . . prejudice."  2 F.4th 687–88.  Chavez-Chilel waited until just before her merits hearing to raise her complaint about the omissions on the NTA, over two years after her proceedings commenced, and did not raise her statutory argument until she appealed to the BIA.  Because her objections were not raised at the "outset of the proceeding," they were untimely and, under De La Rosa, she is required to show prejudice.  As we have explained, she has failed to do so.

That Chavez-Chilel filed her motion roughly one month after Pereira was decided is of no moment.  As previously mentioned, the ruling addresses the stop-time rule.  Moreover, to the extent it is being relied upon as a basis to challenge defects in NTAs, arguments concerning defective NTAs were plainly available before Pereira.  See, e.g., Mejia-Padilla v. Garland, 2 F.4th 1026, 1031 (7th Cir. 2021) (noting that arguments regarding "defect[s] in the notice to appear"

11

B

The BIA also correctly concluded that Chavez-Chilel is not entitled to asylum or withholding of removal. A removable noncitizen may be eligible for asylum if she demonstrates that she is "unable or unwilling to return to, and is unable or unwilling to avail [herself] . . . of the protection of, [the

premised on Pereira could have been raised in 2012 in light of the "statute's plain language"); Salazar-Marroquin v. Barr, 969 F.3d 814, 817 (7th Cir. 2020) ("Petitioner could have raised this argument earlier, relying on . . . the clear statutory text and the Third Circuit's earlier disagreement with the effect of a noncompliant [NTA]." (quotation marks omitted)); Ortiz-Santiago, 924 F.3d at 964 (explaining that a Pereira-based objection could have been lodged in the wake of Orozco-Velasquez v. Attorney General, 817 F.3d 78 (3d Cir. 2016)).

Finally, as to Matter of Arambula-Bravo, 28 I. & N. Dec. 388 (B.I.A. 2021), Chavez-Chilel concedes it neither helps nor hurts her position and simply does "not foreclose" his contention that a "statutory violation is a distinct issue . . . from . . . a jurisdictional defect." ECF No. 27. Indeed, in leaving "further consideration of [8 U.S.C. § 1229(a)] as a claims-processing rule for another day," Arambula-Bravo, 28 I. & N. Dec. at 392 n.3, the BIA highlighted disagreement among Courts of Appeals, comparing De La Rosa with B.R. v. Garland, in which the Court of Appeals for the Ninth Circuit held that "IJs . . . have authority to allow DHS to cure improper service of an NTA without requiring termination of proceedings," 4 F.4th 783, 794 (9th Cir. 2021). Arambula-Bravo is, therefore, also of no assistance to Chavez-Chilel.

Thus, none of the cases identified in Chavez-Chilel's Rule 28(j) letters alters our analysis.

12

country to which she would be removed] because of persecution or a well-founded fear of persecution on account of . . . membership in a [PSG]." 8 U.S.C. § 1101(a)(42)(A); see also id. § 1158(b)(1)(B)(i).

Whether a petitioner's proffered PSG is cognizable "presents a mixed question of law and fact, since the ultimate legal question of cognizability depends on underlying factual questions concerning the group and the society of which it is a part." S.E.R.L. v. Att'y Gen., 894 F.3d 535, 543 (3d Cir. 2018). Accordingly, we "review de novo the ultimate legal conclusion as to the existence of a [PSG]" but "review the underlying factual findings for substantial evidence." Id. (quotation marks and citation omitted).

Substantial evidence supports the BIA's and IJ's finding that "Guatemalan women" is not a cognizable PSG. A PSG must be: "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." S.E.R.L., 894 F.3d at 540 (quotation marks and citation omitted). Particularity "addresses the outer limits of a group's boundaries and is definitional in nature, whereas social distinction focuses on whether the people of a given society would perceive a proposed group as sufficiently separate or distinct." Id. (quotation marks omitted). To satisfy the particularity requirement, "an alleged social group [must] have discrete and . . . definable boundaries that are not amorphous, overbroad, diffuse, or subjective, so as to provide a clear standard for determining who is a member." Id. at 553 (quotation marks and citation omitted).

13

Chavez-Chilel's proposed PSG lacks particularity. "[N]ot every immutable characteristic is sufficiently precise to define a [PSG]," id. at 552, and courts have concluded that a proposed PSG of all women in a particular country "is overbroad[] because no factfinder could reasonably conclude that all [of a country's] women had a well-founded fear of persecution based solely on their gender," Safaie v. INS, 25 F.3d 636, 640 (8th Cir. 1994) (addressing Iranian women).[8] Reasons to depart from this general rule are not present here. For example, in Hassan v. Gonzales, 484 F.3d 513 (8th Cir. 2007), the Court of Appeals for the Eighth Circuit recognized the PSG of all Somali women because "all Somali females have a well-founded fear of persecution based solely on gender given the prevalence of" female genital mutilation. Id. at 518; see also Mohammed v. Gonzales, 400 F.3d 785, 797–98 (9th Cir. 2005) (same); In re Kasinga, 21 I. & N. Dec. 357, 365–66 (B.I.A. 1996) (recognizing PSG of "young women" in a particular tribe in Togo due to pervasive practice of female

---

[8] In Perdomo v. Holder, 611 F.3d 662, 668–69 (9th Cir. 2010), the Court of Appeals for the Ninth Circuit disagreed with the BIA's conclusion that "all women in Guatemala" was too broad a group to qualify as a PSG and remanded for further analysis. That case rested on the Ninth Circuit's two-part definition of a PSG, which recognized any group "united by a voluntary association, including a former association, or by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it." Id. at 666 (quotation marks and emphasis omitted). This definition is not consistent with our Court's three requirements for a PSG, see S.E.R.L., 894 F.3d at 540, so we decline to follow the reasoning in Perdomo.

14

genital mutilation). Here, by contrast, there is no record evidence that all Guatemalan women share a unifying characteristic that results in them being targeted for any form of persecution based solely on their gender. Cf. A.R. 170–73, 182 (Chavez-Chilel's testimony that she knew of no other women who suffered sexual or domestic violence); A.R. 232 (report explaining that one-third more Guatemalan women experience sexual or domestic violence against them than women in Paraguay). Accordingly, while the size of the group standing alone would not disqualify a group from being a PSG, Cece v. Holder, 733 F.3d 662, 674–75 (7th Cir. 2013), Chavez-Chilel has failed to demonstrate that her proposed PSG is sufficiently particularized. Thus, her alleged fear of persecution based upon membership in such a group does not provide a basis for asylum. Because Chavez-Chilel cannot prove her asylum claim, she cannot meet the higher standard to obtain withholding of removal. See Blanco v. Att'y Gen., 967 F.3d 304, 315 (3d Cir. 2020). As a result, the IJ and BIA correctly denied her request for asylum and withholding of removal.[9]

_____

[9] We will also deny Chavez-Chilel's motion for remand to apply for voluntary departure. An application for voluntary departure must be made prior to or at the conclusion of removal proceedings. See 8 C.F.R. § 1240.26(b)-(c). Chavez-Chilel failed to so apply before the IJ's order became final. Accordingly, to seek voluntary departure, Chavez-Chilel must file a motion to reopen with the BIA, not a motion to remand in this Court. See 8 C.F.R. § 1003.2(c)(1) ("A motion to reopen proceedings for the purpose of submitting an application for relief must be accompanied by the appropriate application for relief and all supporting documentation.");

15

## III

For these reasons, we will deny the petition for review.

---

Reynoso-Lopez v. Ashcroft, 369 F.3d 275, 280 (3d Cir. 2004) ("[After the Illegal Immigration Reform and Immigrant Responsibility Act], the executive branch, not the judiciary, is given the sole authority to determine when an alien must depart.").