PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2031
_____

S.E.R.L.; Y.N.S.R.; Y.Y.R.L.,

Petitioners

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals

(BIA-1:A206-800-692, A206-800-690, A206-800-691)
Immigration Judge: Hon. John B. Carle
_____

ARGUED
March 12, 2018

Before: JORDAN, KRAUSE, and GREENBERG,
Circuit Judges

(Filed: July 3, 2018)
_____

David C. Bennion
1706 N. 2nd Street - #L4
Philadelphia, PA   19122

Elizabeth A. Cuneo
Russell H. Falconer   [ARGUED]
Chelsea G. Glover
Gibson Dunn & Crutcher
2100 McKinney Avenue - #1100
Dallas, TX  75201

Charles Roth
Lisa Koop
Ashley Huebner
National Immigrant Justice Center
208 South LaSalle Street
Chicago, IL   60604
        *Counsel for Petitioners*

Jefferson B. Sessions, III
Chad A. Readler
Anthony P. Nicastro
Sheri R. Glaser   [ARGUED]
United States Department of Justice
Office of Immigration Litigation
P. O. Box 878
Ben Franklin Station
Washington, DC   20044
        *Counsel for Respondents*

Blaine M. Bookey
Anne Dutton
Eunice Lee
Karen Musalo
Hastings College of the Law
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA   94102
> *Amicus Counsel for American Immigration*
> *Lawyers Association, Center for Gender &*
> *Refugee Studies, and Hebrew Immigrant*
> *Aid Society PA*

Kirsten L. Nathanson
Crowell & Moring
1001 Pennsylvania Avenue, NW
Washington, DC   20004

Emily T. Kuwahara
Daniel P. Wierzba
Crowell & Moring
515 S. Flower Street 40th Fl.
Los Angeles, CA  90071

Tu-Quyen Pham
Crowell & Moring
3 Park Plaza, 20th Fl.
Irvine, CA  92694
> *Amicus Counsel for NIWAP Inc. and*
> *Pennsylvania Coalition Against Domestic Violence*

—————————

OPINION OF THE COURT

—————————

JORDAN, *Circuit Judge*

In this immigration case, we consider the term "particular social group," which is part of the definition of "refugee" in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(a)(42). We must decide whether a revised interpretation of that term by the Board of Immigration Appeals (the "BIA" or the "Board") is reasonable and therefore entitled to deference under the strictures of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Like other circuit courts, we had dutifully deferred to the initial interpretation of that term given by the Board in *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985), *overruled on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). *Fatin v. I.N.S.*, 12 F.3d 1233, 1239-40 (3d Cir. 1993). But, over time, the Board began adding new requirements to its test for determining whether an applicant had established the existence of a particular social group and could thereby claim refugee status. In *Valdiviezo-Galdamez v. Attorney General*, 663 F.3d 582 (3d Cir. 2011), we concluded that the BIA had departed from *Acosta* without a principled explanation and that its new requirements for proving a particular social group were incapable of consistent application. We therefore held that its interpretation of "particular social group" was not entitled to *Chevron* deference. *Id.* at 608.

4

The BIA has since responded to our concerns. In a pair of precedential decisions, *Matter of M-E-V-G-*, 26 I. & N. Dec. 227 (BIA 2014), and *Matter of W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014), *affirmed in part*, *vacated and remanded in part on other grounds sub nom. Reyes v. Lynch*, 842 F.3d 1125 (9th Cir. 2016), it articulated a three-part test for proving the existence of a cognizable particular social group. The test requires applicants to "establish that the group [at issue] is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *M-E-V-G-*, 26 I. & N. Dec. at 237. We now hold that that statutory interpretation is entitled to *Chevron* deference, and, applying the newly framed test here, we conclude that substantial evidence supports the BIA's determination that the petitioner has not met its requirements. Accordingly, we will deny the petition for review.

## I. BACKGROUND[1]

S.E.R.L., a native of Honduras, seeks review of the denial of her application for asylum and statutory withholding

---

[1] We accept the agency's factual findings as conclusive, unless "any reasonable adjudicator would be compelled to conclude to the contrary[.]" 8 U.S.C. § 1252(b)(4)(B). We therefore recite the facts as found by the immigration judge, who determined that S.E.R.L. testified credibly and afforded her testimony full evidentiary weight, and as accepted by the BIA. We supplement the facts with additional details found in S.E.R.L.'s affidavit and testimony, where consistent with those findings.

of removal based on membership in a proposed particular social group that she characterizes as "immediate family members of Honduran women unable to leave a domestic relationship[.]"[2] (Opening Br. at 21.) She fears persecution by two men, Jose Angel and Juan Orellana. Jose Angel abducted, raped, and continues to stalk one of S.E.R.L.'s daughters, K.Y.R.L. That daughter has already been granted asylum in the United States. Juan Orellana is S.E.R.L.'s stepfather and has repeatedly abused S.E.R.L.'s mother. S.E.R.L. fears that if she is removed to Honduras, both men will persecute her, Jose Angel because of her relationship to her daughter, and Juan Orellana because of her relationship to her mother.

S.E.R.L. and two of her children fled here from Honduras in 2014. Within a month of their unlawful arrival, the Department of Homeland Security initiated removal proceedings pursuant to INA § 212(a)(6)(A)(i).[3] S.E.R.L.

---

[2] This petition for review was filed on behalf of S.E.R.L., as well as two of her minor children, Y.N.S.R. and Y.Y.R.L. The children are derivative applicants on S.E.R.L.'s application for asylum and related relief, so we will refer to S.E.R.L. as the petitioner, in the singular.

[3] That statutory subsection provides:

An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

6

conceded removability, and timely applied for asylum and statutory withholding of removal.[4] In support of her claims for relief, she alleged past persecution and a fear of future persecution based on the relationships just noted.

An immigration judge ("IJ") reviewed S.E.R.L.'s application and conducted a merits hearing. Although finding her credible, the IJ concluded that S.E.R.L. had not met her burden to establish eligibility for any of the relief she had requested. According to the IJ, S.E.R.L. had not established past persecution or an objectively reasonable fear of future persecution by Jose Angel, given that he had targeted S.E.R.L.'s daughter, not her. Though crediting S.E.R.L.'s testimony about Juan Orellana's abuse of her mother and past threats directed at S.E.R.L., herself, the IJ also noted that S.E.R.L. said "her stepfather never physically harmed her." (Administrative Record ("AR") at 86.) The IJ did not state whether S.E.R.L. had established past persecution by Juan Orellana.

The IJ did say that, even if she had suffered past persecution, S.E.R.L. failed to establish that the harm she suffered was on account of a protected ground. Applying the BIA's newly clarified three-part test from *M-E-V-G-*, the IJ rejected S.E.R.L.'s argument that "immediate family members of Honduran women unable to leave a domestic relationship" constituted a cognizable group. (AR at 89-90.) According to the IJ, the group "lack[ed] the requisite level of

8 U.S.C. § 1182(a)(6)(A)(i).

[4] S.E.R.L. also initially sought protection under the Convention Against Torture but no longer pursues that relief.

7

particularity and social distinction" and thus failed the test's second and third requirements. (AR at 90.) The IJ also noted that "asylum and refugee laws do not protect people from general conditions of strife, such as crime and other societal afflictions." (AR at 90 (quoting *M-E-V-G-*, 26 I. & N. Dec. at 235).) Consequently, the IJ denied relief and ordered that S.E.R.L. be removed.[5]

She appealed that decision to the BIA. It too concluded that she had not met her burden to establish eligibility for either asylum or withholding of removal. It agreed with the IJ's conclusion that she had not established past persecution by Jose Angel, and it further concluded that she had not established past persecution by Juan Orellana, because any threats he made "d[id] not rise to the level of persecution[.]" (AR at 4.)

The BIA also agreed that S.E.R.L.'s proposed particular social group – immediate family members of Honduran women unable to leave a domestic relationship – lacked the requisite particularity and social distinction. As to

---

[5] The IJ rejected three other particular social groups proposed by S.E.R.L. as alternatives, including (1) Honduran women unable to leave a domestic relationship, (2) immediate family members of young Honduran women without a father in the home, and (3) Honduran women who report gender-based crimes to the police. S.E.R.L. has not challenged those rulings in her petition to us and so those proposed groups are not before us. *See Frias-Camilo v. Att'y Gen.*, 826 F.3d 699, 701 n.1 (3d Cir. 2016) (explaining that a petitioner's failure to challenge certain portions of the BIA's decision results in waiver).

8

particularity, the BIA observed that "[the] proposed group could include individuals of any age, sex, or background, and it is not limited to those who … take overt action to assist, or are meaningfully involved with, the family member who is unable to leave a domestic relationship." (AR at 5.) The BIA further "agree[d] that [S.E.R.L.] ha[d] not presented evidence that this group is socially distinct within Honduran society, as the record does not reflect that members of such a group would be perceived, considered, or recognized in Honduras as a distinct group[.]" (AR at 5.) Even assuming a cognizable particular social group, the Board "discern[ed] no legal error or clear factual error" in the IJ's determination that S.E.R.L. had not established a well-founded fear of future persecution by Jose Angel. (AR at 5-6.) The Board did not, however, reach the issue of future persecution by Juan Orellana.

It turned last to the question of withholding of removal and concluded that, "[i]nasmuch as [S.E.R.L.] has failed to satisfy the lower burden of proof required for asylum, it follows that she has failed to satisfy the more stringent standard required for withholding of removal[.]" (AR at 6.) The Board thus dismissed the appeal. S.E.R.L. has timely petitioned for review.

9

## II.    DISCUSSION[6]

S.E.R.L. contends that she is entitled to asylum and withholding of removal because she has established a well-founded fear of future persecution on account of her membership in a legally cognizable particular social group, that again being "immediate family members of Honduran women unable to leave a domestic relationship[.]" (Opening Br. at 21.)  The parties' primary dispute is whether the BIA's revised interpretation of "particular social group," as set forth in *Matter of M-E-V-G-*, warrants *Chevron* deference.  S.E.R.L., supported by amici,[7] asks us to reject the test from *M-E-V-G-* because it is "deeply flawed," "has no basis in the asylum statute," and fails to resolve the concerns raised in our

---

[6] The BIA had jurisdiction under 8 U.S.C. § 1103 and 8 C.F.R. § 1003.1(b).  Because "denial of … [an] applicant's petition for asylum, withholding of removal, and relief under the CAT constitutes a final order of removal," *Shehu v. Att'y Gen.*, 482 F.3d 652, 656 (3d Cir. 2007) (internal quotation marks and citation omitted), we have appellate jurisdiction pursuant to 8 U.S.C. § 1252(a).

[7] We thank the National Immigrant Women's Advocacy Project and the Pennsylvania Coalition Against Domestic Violence, and the Center for Gender & Refugee Studies, American Immigration Lawyers Association, and Hebrew Immigrant Aid Society Pennsylvania for filing amicus briefs in this matter, which have assisted our consideration of the legal issues before us and also shine a light on an issue of international concern:  violence against women, including Honduran women who intervene on behalf of victims suffering from domestic abuse.

decision in *Valdiviezo-Galdamez*. (Opening Br. at 1-2.) Instead, S.E.R.L. argues, we should continue to apply the test from *Matter of Acosta*, which she claims to "satisf[y] … with ease." (Opening Br. at 22.) She also says that, in the event the Board's new interpretation is given deference, she has met its particularity and social distinction requirements. Finally, she contends that remand is required, if for no other reason, because neither the IJ nor the BIA addressed whether she has a well-founded fear of future persecution by Juan Orellana.

Before we address those arguments, we first discuss the governing legal principles and provide a review of our *Valdiviezo-Galdamez* decision and the BIA's response in *M-E-V-G-*.

## A.   General Legal Principles

### 1.   Standard of Review

Whether a petitioner's "proffered particular social group is cognizable under [8 U.S.C. § 1101(a)(42)(A)] is a question of law … subject to de novo review," which, we have said, is "subject to established principles of [*Chevron*] deference[.]" *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 339 (3d Cir. 2008) (internal quotation marks and citation omitted).[8]   More precisely, the existence of a cognizable

---

[8] In cases like this one, we have often described the governing standard of review as being "de novo, subject to principles of *Chevron* deference." *See Mondragon-Gonzalez v. Att'y Gen.*, 884 F.3d 155, 158 (3d Cir. 2018) ("We accord *de novo* review to questions of law, including the BIA's interpretation of the INA, subject to the deference dictated by

11

particular social group presents a mixed question of law and fact, since the ultimate legal question of cognizability depends on underlying factual questions concerning the group and the society of which it is a part. *Cf. Fatin*, 12 F.3d at 1240-41 (noting the "sparse" evidence supporting the petitioner's proposed particular social group, and concluding that, even if cognizable, "the administrative record does not establish that she is a member of [her proposed] group"). We thus review de novo the ultimate legal conclusion as to the existence of a particular social group, while we review the underlying factual findings for "substantial evidence[.]" *See Lukwago v. Ashcroft*, 329 F.3d 157, 167 (3d Cir. 2003) (reviewing the BIA's statutory interpretation of "particular social group" in accordance with *Chevron* principles, and stating, "[o]n the other hand, we must treat the BIA's findings of fact as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary'" (quoting 8 U.S.C. § 1252(b)(4)(B))).

Whether a petitioner has established membership in a particular social group also involves agency fact-finding. *Id.* at 167, 178-79. "Our review is confined solely to the administrative record," *Gomez-Zuluaga*, 527 F.3d at 340, and administrative findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," *id.* (quoting 8 U.S.C. § 1252(b)(4)(B)). That means that factual "determinations will be upheld if they are

---

*Chevron*[.]"). That may sound like a contradiction in terms. What we mean is that we are required by *Chevron* principles to defer to the BIA's interpretation of the INA, when reasonable, but we review de novo any legal challenge to the application of that interpretation.

12

supported by reasonable, substantial, and probative evidence in the record considered as a whole." *Kang v. Att'y Gen.*, 611 F.3d 157, 164 (3d Cir. 2010) (citation omitted).

Because here "the BIA adopted and affirmed the IJ's decisions and orders as well as [conducting] an independent analysis, we review both the IJ's and the BIA's decisions and orders." *Ordonez-Tevalan v. Att'y Gen.*, 837 F.3d 331, 340-41 (3d Cir. 2016). But we look to the IJ's opinion "only where the BIA has substantially relied on that opinion." *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009), *as amended* (Nov. 4, 2009).

## 2. Asylum and Withholding of Removal

Under the INA, the Attorney General has the discretion to grant asylum to a removable alien, 8 U.S.C. § 1158(b)(1)(A), as long as the alien meets the INA's definition of "refugee." That definition is as follows:

> Any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

*Id.* § 1101(a)(42)(A).

13

A petitioner has the burden to establish that she is a refugee, and thus eligible for asylum relief under the INA. *Id.* § 1158(b)(1)(B). One way of doing so is to show "a well-founded fear of persecution on account of … membership in a particular social group[.]" *Id.* § 1101(a)(42)(A). That is the route S.E.R.L. chose to pursue, and so she bore the burden of establishing the following elements: (1) a particular social group that is legally cognizable; (2) membership in that group; (3) a well-founded fear of persecution, which must be subjectively genuine and objectively reasonable; and (4) a nexus, or causal link, between the persecution and membership in the particular social group. *Fatin*, 12 F.3d at 1240.[9]

As for withholding of removal, under 8 U.S.C. § 1231(b)(3), an alien must "establish a 'clear probability of persecution,' i.e., that it is more likely than not, that s/he would suffer persecution upon returning home." *Valdiviezo-*

---

[9] Our decision in *Fatin v. I.N.S.* lays these out as three elements, combining into one what we have noted here as elements (3) and (4). *See Fatin*, 12 F.3d at 1240 ("The alien must … (3) show that he or she would be persecuted or has a well-founded fear of persecution based on that membership."). Because the issue of nexus between alleged persecution and membership in a particular social group is sometimes the focus of dispute, *see Gomez-Zuluaga*, 527 F.3d at 343-45 (reviewing the BIA's conclusion that the petitioner "failed … [to] show her political opinion or her particular social group constituted 'at least one central reason' for her persecution"), we have thought it best to frame it here as a separate element of proof.

*Galdamez*, 663 F.3d at 591 (citing *I.N.S. v. Stevic*, 467 U.S. 407, 429-30 (1984)). "Since [that] standard is more demanding than that governing eligibility for asylum, an alien who fails to qualify for asylum is necessarily ineligible for withholding of removal." *Id.*

## B. Our Decision in *Valdiviezo-Galdamez* and the BIA's Response in *Matter of M-E-V-G-*

In *Valdiviezo-Galdamez*, we reviewed at length the BIA's evolving efforts to interpret the term "particular social group," beginning with the definition it set forth in *Matter of Acosta*. We need not fully repeat that history here but, for purposes of our analysis, will summarize a few important points from the pertinent decisions of the BIA.

From 1985 to 2006, the Board interpreted "particular social group" to mean "a group of persons all of whom share a common, immutable characteristic." *Valdiviezo-Galdamez*, 663 F.3d at 595 (quoting *Acosta*, 19 I. & N. Dec. at 233). That standard became known as the *Acosta* test. It was rooted in the interpretive doctrine of *ejusdem generis*, which teaches that words in a list should be understood as referring to things of the same general class or kind. *Acosta*, 19 I. & N. Dec. at 233. In the context of the statutory definition of "refugee," that means that the term "particular social group" should be understood as being akin to the other characteristics listed in the definition, namely race, religion, nationality, and political opinion. 8 U.S.C. § 1101(a)(42)(A); *see also id.* §§ 1158(b)(1), 1231(b)(3). According to the BIA, all of those focus on "an immutable characteristic," which the BIA explained includes both those characteristics that are technically "immutable" as well as those a person "should not

15

be required" to change "as a matter of conscience" to avoid persecution. *Acosta*, 19 I. & N. Dec. at 233-34. Thus, the *Acosta* test required members of a "particular social group" to have "a common, immutable characteristic" that "the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.* The BIA listed examples of innate characteristics, like "sex, color, or kinship ties[.]" *Id.* It also noted that, in certain circumstances, "a shared past experience such as former military leadership or land ownership" could be the defining characteristic of a cognizable "particular social group," but such determinations would be made "on a case-by-case basis."[10] *Id.*

Over time, employing the *Acosta* test, the BIA recognized several particular social groups based on discernable and immutable characteristics. For example, in *In re H-,* 21 I. & N. Dec. 337 (BIA 1996), it accepted "kinship" as an immutable characteristic, concluding that "[t]he record before us makes clear not only that the Marehan [– a familial sub-clan in Somalia –] share ties of kinship, but that they are identifiable as a group based upon linguistic commonalities." *Id.* at 343. Importantly, however, in other cases, the Board accepted particular social groups that did not share such plainly discernable characteristics. In *Matter of Fuentes*, 19 I.

---

[10] In *Acosta*, itself, the petitioner had claimed persecution on account of his membership in a group of San Salvador taxi drivers who refused to participate in guerrilla-sponsored work stoppages. *Id.* at 216-17. The BIA rejected that proposed group under the "immutable characteristic" test, concluding that a taxi driver could change his occupation and avoid the danger he faced. *Id.* at 233-34.

& N. Dec. 658 (BIA 1988), it recognized the status of being a former policeman as an innate characteristic and, although not definitively reaching the issue in that case, it stated that mistreatment because of that status could constitute persecution on account of political opinion or membership in a particular social group. *Id.* at 662-63. In *Matter of Toboso-Alfonso*, 20 I. & N. Dec. 819 (BIA 1990), it accepted a particular social group of homosexuals in Cuba. *Id.* at 822-23. And in *In re Kasinga*, 21 I. & N. Dec. 357 (BIA 1996), it accepted the particular social group of "young women of the Tchamba-Kunsuntu Tribe who have not had [female genital mutilation], as practiced by that tribe, and who oppose the practice." *Id.* at 365.

Eventually, the BIA determined that the *Acosta* test had proven to be over-inclusive and unworkable, in part because it encompassed virtually any past acts or experiences, since the past cannot be changed and is, by definition, immutable. Thus, in 1999, the BIA began supplementing the *Acosta* test with additional requirements. *Valdiviezo-Galdamez*, 663 F.3d at 596-97. For example, in *In re R-A-*, 22 I. & N. Dec. 906 (BIA 1999; A.G. 2001), *remanded for reconsideration in Matter of R-A-*, 24 I. & N. Dec. 629 (A.G. 2008),[11] it took issue with particular social groups that were "defined principally, if not exclusively, for the purposes of

_____

[11] In that case, the Attorney General remanded the case for reconsideration in light of the Board's intervening decisions. *See Matter of R-A-*, 24 I. & N. Dec. at 630 (citing *Matter of E-A-G-*, 24 I. & N. Dec. 591 (BIA 2008); *Matter of S-E-G-*, 24 I. & N. Dec. 579 (BIA 2008); *In re A-M-E- & J-G-U-*, 24 I. & N. Dec. 69 (BIA 2007); *In re C-A-*, 23 I. & N. Dec. 951 (BIA 2006)).

[litigation] … without regard to the question of whether anyone in [a given country] perceives [those] group[s] to exist in any form whatsoever." *Id.* at 918. Although the Board maintained that the *Acosta* test was the starting point for assessing particular social groups, it said that the test would no longer be the ending point. *Id.* at 919. Other factors would be considered, including whether the alleged defining characteristic of the social group is important within the society in question and whether that society understands or recognizes the proposed social group as a distinct segment of the population. *Id.* at 918-19.

By 2006, the BIA appeared to have transformed its requirements for establishing a particular social group into a new three-part test: (1) the original *Acosta* test, requiring members to have a common, immutable characteristic; (2) social visibility, meaning that members of the social group are visible and recognizable by others in the society in question; and (3) particularity, meaning that the group has defined boundaries. *See Valdiviezo-Galdamez*, 663 F.3d at 599 (citing a pair of BIA cases as establishing the social visibility and particularity requirements, *In re C-A-*, 23 I. & N. Dec. 951 (BIA 2006), *aff'd sub nom. Castillo-Arias v. Att'y Gen.*, 446 F.3d 1190 (11th Cir. 2006), and *In re A-M-E- & J-G-U-*, 24 I. & N. Dec. 69 (BIA 2007), *aff'd sub nom. Ucelo-Gomez v. Mukasey*, 509 F.3d 70 (2d Cir. 2007)). Although several of our sister courts of appeals gave *Chevron* deference to that interpretation,[12] we, along with the Seventh

---

[12] *See Valdiviezo-Galdamez*, 663 F.3d at 603 n.16 (noting that the First, Second, Eighth, Ninth, and Eleventh Circuits had accepted the BIA's three-part definition without issue).

18

Circuit, rejected the BIA's social visibility and particularity requirements. *Id.* at 603-09; *see also Benitez Ramos v. Holder*, 589 F.3d 426 (7th Cir. 2009); *Gatimi v. Holder*, 578 F.3d 611 (7th Cir. 2009).

In *Valdiviezo-Galdamez,* we took issue with the BIA's departure from *Acosta*. 663 F.3d at 603-09; *see also id.* at 613 (Hardiman, J., concurring). Two specific concerns animated our analysis. First, we said that the BIA had applied the "social visibility" requirement in an "inconsistent" manner. *Id.* at 603-04. Specifically, we expressed concern that, in cases like *In re C-A-*, the Board had referred to "social visibility" as "recognizability" and as "involv[ing] characteristics that were highly visible and recognizable by others in the country in question," *id.* at 603 (quoting *C-A-,* 23 I. & N. Dec. at 959-60), yet in other cases, it had accepted particular social groups for refugee status based on internal characteristics that lacked any apparent visibility, absent self-disclosure, including "women who are opposed to female genital mutilation (*Matter of Kasinga*), homosexuals required to register in Cuba, (*Matter of Toboso-Alfonso*), and former members of the El Salvador national police (*Matter of Fuentes*)." *Id.* at 604.

We cited the Seventh Circuit's criticism that "[o]ften it is unclear whether the Board is using the term 'social visibility' in the literal sense, or in the 'external criterion' sense, or even whether it understands the difference." *Id.* at 606 (quoting *Benitez Ramos*, 589 F.3d at 430). Because the BIA had applied the social visibility requirement inconsistently, we concluded that it was "an unreasonable addition to the requirements for establishing refugee status

19

where that status turns upon persecution on account of membership in a particular social group." *Id.* at 604.

Second, we said that social visibility and particularity "appear to be different articulations of the same concept," *id.* at 608, at least as the BIA had defined them in prior decisions. *Id.* at 607. To illustrate the point, we quoted the decision in *Matter of S-E-G-*, 24 I. & N. Dec. 579 (BIA 2008), in which the BIA described the "essence" of particularity as an assessment of "whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons," and noted that the size of the group "may be an important factor[.]" *Id.* at 607 (quoting *S-E-G-*, 24 I. & N. Dec. at 584). The BIA did go on to say that "the key question is whether the proposed description is sufficiently particular, or is too amorphous ... to create a benchmark for determining group membership," *id.* (alteration in original) (quoting *S-E-G-*, 24 I. & N. Dec. at 584), but what it said about the essence of particularity led us to reject the requirement as both confusing and "little more than a reworked definition of 'social visibility[.]'" *Id.* at 608.

Having decided that "the BIA's requirements that a 'particular social group' possess the elements of 'social visibility' and 'particularity' [were] inconsistent with prior BIA decisions" and repetitive, we then held that they were not entitled to *Chevron* deference. *Id.* But we expressly noted that the BIA was free to depart from or change its interpretation of "particular social group," and that a new view could be entitled to deference if supported by a "principled reason" and explanation for any new

20

requirements.[13]  *Id.*  In the aftermath of *Valdiviezo-Galdamez*, we continued to apply the BIA's original *Acosta* test.  *See, e.g.*, *Garcia v. Att'y Gen.*, 665 F.3d 496, 504 n.5 (3d Cir. 2011) ("Until the BIA provides an analysis that adequately supports its departure from *Acosta*, we remain bound by the well-established definition of 'particular social group' found in *Fatin* [where we adopted the *Acosta* test].").

The BIA promptly responded to our concerns and announced a revised interpretation of "particular social group" in *Matter of M-E-V-G-*, which it also applied in a companion case pending in the Ninth Circuit, *Matter of W-G-R-*.  The Board adhered to its more restrictive interpretation of particular social group, and it clarified the three requirements that an applicant for asylum or withholding of removal must satisfy to establish a cognizable

---

[13] In a concurring opinion, Judge Hardiman said:

> [T]he only problem that I find with the BIA's evolving approach to 'particular social group' cases is that the Board has failed to acknowledge a change in course and forthrightly address how that change affects the continued validity of conflicting precedent. Accordingly, remand is necessary so the Board can either choose between its reasonable new requirements and its older but equally reasonable precedents, or reconcile the two interpretations in a coherent way.

*Valdiviezo-Galdamez*, 663 F.3d at 612 (Hardiman, J., concurring).

particular social group. As stated in *M-E-V-G-*, an applicant must "establish that the [proposed] group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." 26 I. & N. Dec. at 237.

The BIA reviewed its prior efforts to outline what constitutes a "particular social group." *Id.* It said that the addition of "particularity" and "social distinction" as required elements is both "consistent with … the language of the [INA]" as well as consistent with the interpretation "set forth in *Matter of Acosta*[.]" *Id.*; *see also id.* at 234 (citing earlier cases, and stating that it would continue to "adhere to the social group requirements announced in" its prior decisions). It explained that the INA's "enumerated grounds of persecution have more in common than simply describing persecution aimed at an immutable characteristic. They have an external perception component within a given society, which … separates various factions within a particular society." *Id.* at 236. In the Board's view, adding "particularity" and "social distinction" as requirements for proving a particular social group became necessary, based on its experience in cases since *Acosta*. *Id.* at 232-33.

The "particularity" requirement, it said, "is included in the plain language of the [statute] and is consistent with the specificity by which race, religion, nationality, and political opinion are commonly defined." *Id.* at 239. "Particularity" is largely definitional, ensuring that the characteristics defining a group "provide a clear benchmark for determining who falls within the group." *Id.* The BIA explained that particularity requires the group to be "discrete and have definable boundaries" that are not "amorphous, overbroad, diffuse, or

22

subjective," ensuring that an immutable characteristic is "sufficiently precise to define a particular social group." *Id.*

The "social distinction" requirement, it said, was a reworking of the social visibility requirement and was intended to resolve any "misconception" that literal visibility was meant. *Id.* at 236. According to the BIA, social visibility "was never meant to be read literally." *Id.* at 240. The change in terminology to "social distinction" was made to "clarif[y] that social visibility does not mean 'ocular' visibility – either of the group as a whole or of individuals within the group – any more than a person holding a protected religious or political belief must be 'ocularly' visible to others in society." *Id.* Instead, the Board explained, "[t]o be socially distinct, a group need not be seen by society; rather, it must be perceived as a group by society." *Id.*

The Board noted our concern about the inconsistent application of the former "social visibility" requirement, and described why it viewed the revised social distinction requirement as nevertheless being an appropriate approach. It stated:

> It may not be easy or possible to identify who is opposed to [female genital mutilation], who is homosexual, or who is a former member of the national police. These immutable characteristics are certainly not ocularly visible. Nonetheless, a society could still perceive [members of those groups] to comprise a particular social group for a host of reasons, such as sociopolitical or cultural conditions in the country.

23

*Id.* at 240.

For that reason, it said, "the fact that members of a particular social group may make efforts to hide their membership in the group to avoid persecution does not deprive the group of its protected status as a particular social group." *Id.* The BIA also directly addressed its prior decision in *In re C-A-*, stating, "to the extent that [the decision] has been interpreted as requiring literal or 'ocular' visibility, we now clarify that it does not." *Id.* at 246-47.

The BIA then answered our concern that particularity and social visibility, now recast as social distinction, are not discernibly different. *Id.* at 240-41. Although acknowledging that "there is considerable overlap" between particularity and social distinction, the BIA explained its view that they are both different and necessary. *Id.* It said that, although relying on an overlapping body of evidence, "each emphasize[s] a different aspect of a particular social group." *Id.* at 241. "Particularity" addresses "the 'outer limits' of a group's boundaries and is definitional in nature," whereas "social distinction" focuses on "whether the people of a given society would perceive a proposed group as sufficiently separate or distinct[.]" *Id.*

Finally, the BIA also took the opportunity to emphasize that "a group's recognition for asylum purposes is determined by the perception of the society in question, rather than by the perception of the persecutor." *Id.* at 242. There must be a distinction, the Board explained, between the INA's requirement that an applicant "establish[] the existence of one of the enumerated grounds," including "particular social

24

group," and the INA's nexus requirement, which addresses whether an applicant has suffered persecution "on account of" that enumerated ground. *Id.* Although relevant to the extent indicative of society's views as a whole, the Board stated that "persecutory conduct alone cannot define [a particular social] group." *Id.*

With that background in mind, we now turn to the main dispute in this case – whether the revised test for determining the cognizability of a particular social group resolves the concerns we raised in *Valdiviezo-Galdamez* and is therefore entitled to *Chevron* deference.

## C. The BIA's Revised Interpretation of "Particular Social Group" is Entitled to *Chevron* Deference

"Congress has charged the Attorney General with administering the INA," who has chosen to delegate that authority to the BIA. *Negusie v. Holder*, 555 U.S. 511, 516-17 (2009). And, "[c]onsistent with the rule in *Chevron …*, the BIA is entitled to deference in interpreting ambiguous provisions of the INA." *Id.* at 516. The Supreme Court has instructed that "[j]udicial deference in the immigration context is of special importance, for executive officials exercise especially sensitive political functions that implicate questions of foreign relations." *Id.* at 517 (internal quotation marks and citation omitted); *see also id.* (noting that the judiciary is not well-suited to assume primary responsibility for assessing important diplomatic factors). Hence, "the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms 'concrete meaning through a process of case-

by-case adjudication.'" *Id.* (quoting *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)).

The familiar *Chevron* two-step analysis thus applies with full force in the immigration context. When "considering an interpretation adopted by the Board, we must ask 'whether Congress has directly spoken to the precise question at issue.'" *Fatin*, 12 F.3d at 1239 (quoting *Chevron*, 467 U.S. at 842). "If it has not, we may not 'simply impose [our] own construction on the statute.'" *Id.* (alteration in original) (quoting *Chevron*, 467 U.S. at 843). "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* (quoting *Chevron*, 467 U.S. at 843).

Our case law has already established that the term "particular social group" is undefined in the statute, and its meaning is unclear. We have observed that "[b]oth courts and commentators have struggled to define 'particular social group.' Read in its broadest literal sense, the phrase is almost completely open-ended." *Valdiviezo-Galdamez*, 663 F.3d at 594 (quoting *Fatin*, 12 F.3d at 1238). The statutory language is "not very instructive" and there is scant evidence of legislative intent. *Id.* (quoting *Fatin*, 12 F.3d at 1238). Thus, the question before us now, as in the past, is whether the Board's interpretation of that ambiguous term is a reasonable one.[14]

---

[14] Although initially contending that the BIA's new interpretation fails *Chevron* step one, S.E.R.L. acknowledged at oral argument that the *Chevron* framework applies, and that the term "particular social group" is ambiguous. We agree

S.E.R.L. contends that the BIA's change in nomenclature from "social visibility" to "social distinction" is the only change the BIA has made to its test for assessing a "particular social group," and, she says, that is a "distinction without a difference." (Reply Br. at 5.) According to S.E.R.L., our decision in *Valdiviezo-Galdamez* forecloses application of the "particularity" and "social distinction" requirements. She also argues that the BIA plainly acknowledges that it has not changed course, nor has it provided a "principled" explanation for why it continues to impose criteria we rejected in *Valdiviezo-Galdamez*. (Opening Br. at 31.)

In addition, those who have filed amicus briefs in this case point out that the BIA's decisions in *M-E-V-G-* and *W-G-R-* could be read as inconsistent with certain other BIA decisions and contrary to the canon of *ejusdem generis*. Amici note, for example, that in *W-G-R-*, the BIA concluded that "'former members of the Mara 18 gang in El Salvador who have renounced their gang membership' does not constitute a particular social group" in part because "the group could include persons of any age, sex, or background." 26 I. & N. Dec. at 221. Yet, even though the groups varied significantly across age, sex, and background, the BIA has also held that "Filipinos of Chinese [a]ncestry" constituted a "particular social group," *In re V-T-S-*, 21 I. & N. Dec. 792, 798 (BIA 1997), and that "former member[s] of the national

and thus proceed directly to step two. *See Valdiviezo-Galdamez,* 663 F.3d at 603 (rejecting the petitioner's argument that the BIA's particularity and social visibility requirements were contrary to the intent of the INA).

police" in El Salvador, *Fuentes*, 19 I. & N. Dec. at 662, likewise could be cognizable.[15]  And although the BIA expressly justified its new requirements as "[c]onsistent with the interpretive canon 'ejusdem generis,'" *M-E-V-G-*, 26 I. & N. Dec. at 234, amici highlight that some of the enumerated grounds for persecution, including "political opinion," and "religion," 8 U.S.C. § 1101(a)(42)(A), may themselves be thought of as amorphous, diffuse, or subjective and therefore as insufficient bases for PSGs under *M-E-V-G-*'s requirements.

Those critiques raise legitimate concerns.  The BIA has chosen to maintain a three-part test for determining the existence of a particular social group, and it has discussed how the revised particularity and social distinction requirements are not a departure from but a ratification of requirements articulated in its prior decisions.  *M-E-V-G-*, 26 I. & N. Dec. at 234.  And the arguable inconsistencies in its precedent highlight the risk that those requirements could be applied arbitrarily and interpreted to impose an unreasonably high evidentiary burden, especially for pro se petitioners, at the threshold.  At the same time, however, we recognize that *M-E-V-G-* is a relatively recent decision and clarity and consistency can be expected to emerge with the accretion of case law.  That process is aided by *M-E-V-G-* itself, which

---

[15] Although S.E.R.L. also relies heavily on *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014), where the BIA had held that "married women in Guatemala who are unable to leave their relationship" constituted a particular social group, the Attorney General recently issued a decision overruling *A-R-C-G-*.  *See Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018).

28

addressed the specific concerns we raised in *Valdiviezo-Galdamez*, and explained why the particularity and social distinction requirements are different from one another and necessary. We now consider each of those requirements, beginning with social distinction, to explain why, notwithstanding our concerns, we conclude that the requirements are reasonable and warrant *Chevron* deference.

## 1. Social Distinction

"Social distinction" means social recognition, or "whether the people of a given society would perceive a proposed group as sufficiently separate or distinct[.]" *M-E-V-G-*, 26 I. & N. Dec. at 241. The BIA has clarified that "social distinction" is not a matter of being "seen" by society in an "ocular" sense, as one might have understood from decisions applying the old "social visibility" factor. *Id.* at 240. The change in terminology from "social visibility" to "social distinction" was intended to resolve any "misconception" that literal visibility was a requirement. *Id.* at 236. As defined in *M-E-V-G-*, social distinction accounts for the particular social groups that the BIA has recognized in the past and wishes to continue to recognize, including those whose members share an immutable, though not literally visible, characteristic.[16] *See id.* at 244-45 (addressing

---

[16] S.E.R.L. argues that the Board's interpretation in *M-E-V-G-* is unreasonable because the petitioners that prevailed in several earlier cases could not have satisfied the new test on the record before the agency in those cases. If that were the litmus for assessing an agency's revised interpretation, however, then its first interpretation would be all but set in stone. The Supreme Court has expressly

*Kasinga, Toboso-Alfonso*, and *Fuentes*). The Board thus addressed our concern in *Valdiviezo-Galdamez* that it had seemingly defined "social visibility" in "the literal sense" and had been applying it inconsistently. *Valdiviezo-Galdamez*, 663 F.3d at 606 (quoting *Benitez Ramos*, 589 F.3d at 430).

S.E.R.L. nevertheless suggests that by defining the "social distinction" factor as based on the perception of the society in question rather than by the perception of the persecutor, the Board has impermissibly conflated the INA's "particular social group" and "nexus" requirements, rendering the test set forth in *Matter of M-E-V-G-* an unreasonable interpretation. We disagree, and we are not the first court to do so.

Reviewing the companion case to *M-E-V-G-*, the Ninth Circuit considered and rejected a similar challenge. In *Reyes v. Lynch*, the court concluded that "the 'social distinction' requirement is not redundant in light of the 'nexus' requirement for asylum and withholding claims." 842 F.3d 1125, 1136 (9th Cir. 2016) (reviewing *W-G-R-*), *cert. denied sub nom. Reyes v. Sessions*, 138 S. Ct. 736 (2018). "Rather than conflate the 'social distinction' and 'nexus' requirements," the court said, "the BIA's reasoning reflects

_____

rejected such a rigid standard and has acknowledged that an agency "must consider varying interpretations and the wisdom of its policy on a continuing basis," *Rust v. Sullivan*, 500 U.S. 173, 186 (1991) (citation omitted), and, when it concludes that deviation is required, that it "display awareness that it is changing position" and "provide reasoned explanation" for the change, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis omitted).

an appreciation of the need to distinguish between the showing an applicant must make in order to demonstrate membership in a 'particular social group' and the showing that is necessary to demonstrate that he was persecuted, or fears persecution, 'on account of' that membership." *Id.*; *see also I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (explaining that the INA "makes motive critical" and requiring that an asylum applicant present evidence of his persecutors' motives to satisfy the "nexus" requirement). That reasoning is entirely persuasive.

It is well within the bounds of reasonableness for the BIA to interpret the term "particular social group" in the INA as requiring evidence that the society in question recognizes a proposed group as distinct. The persecutor's motive may be relevant but is not alone sufficient in that regard. *See M-E-V-G-*, 26 I. & N. Dec. at 243. Otherwise, every act of persecution could be claimed as being on the basis of a protected ground, since the internal motivations of a persecutor are likely to be more obscure than are the perceptions of a society generally. Also, one bad actor's twisted views should not be attributed to a whole society. We therefore agree with the Ninth Circuit that the BIA's interpretation better maintains the distinction between "particular social group" and the "nexus" requirement.

Finally, although we are cognizant of arguable inconsistencies in its application to date and the need for careful review by the BIA and this Court to ensure a fair and principled approach, we reject the suggestion by S.E.R.L. and amici that the BIA's social distinction requirement is categorically incapable of rational application and that the BIA has failed to "provide meaningful guidance about how

31

one would establish social distinction." (Reply Br. at 17.) In *M-E-V-G-*, the BIA described the kind of evidence that a petitioner could rely on, stating "[e]vidence such as country conditions reports, expert witness testimony, and press accounts of discriminatory laws and policies, historical animosities, and the like may establish that a group exists and is perceived as 'distinct' … in a particular society." 26 I. & N. Dec. at 244. We do not read that list as exclusive, and it is not unlike evidence the Board relies on in petitions alleging persecution on account of other enumerated grounds. *See generally Sheriff v. Att'y Gen.*, 587 F.3d 584, 592 (3d Cir. 2009) (discussing regulations "explicitly envision[ing] that the BIA will consider Country Reports" and other official documents); *Lukwago*, 329 F.3d at 169-71, 177 (noting the use of testimonial, documentary, and expert evidence). Thus, we conclude that the social distinction requirement is a reasonable feature of the BIA's interpretation of "particular social group."

### 2.      Particularity

Likewise, the particularity requirement is reasonable. The word "particular" is in the text of the statute, 8 U.S.C. § 1101(a)(42)(A), and it is sensible to construe that word as requiring an alleged social group to have "discrete and … definable boundaries" that are not "amorphous, overbroad, diffuse, or subjective," *M-E-V-G-*, 26 I. & N. Dec. at 239, so as to provide a clear standard for determining who is a member of it, *W-G-R-*, 26 I. & N. Dec. at 214. The BIA has explained that the "particularity requirement … clarif[ies] the point, at least implicit in earlier case law, that not every immutable characteristic is sufficiently precise to define a particular social group." *Id.* at 213. For example, in *Escobar*

*v. Gonzales*, 417 F.3d 363 (3d Cir. 2005), a proposed particular social group defined by "[p]overty, homelessness, and youth" was held to be "too vague and all encompassing" to set discernible parameters. *Id.* at 368.[17]

Given its explicit roots in the statute and the sensible explanation of a need for some measure of definitional precision, the particularity requirement is also a reasonable feature of the BIA's interpretation of "particular social group."

---

[17] *See also, e.g.*, *S-E-G-*, 24 I. & N. Dec. at 584-85 (stating that "the key question is whether the proposed description is sufficiently particular, or is too amorphous ... to create a benchmark for determining group membership," and rejecting the proposed group of "male children who lack stable families and meaningful adult protection, who are from middle and low income classes, who live in the territories controlled by the MS-13 gang, and who refuse recruitment" as too amorphous (alteration in original) (internal quotation marks and citation omitted)); *A-M-E- & J-G-U-*, 24 I. & N. Dec. at 76-77 (explaining that "affluent Guatemalans" did not qualify as a particular social group in part because the "characteristic of wealth or affluence is simply too subjective, inchoate, and variable to provide the sole basis for membership"); *C-A-*, 23 I. & N. Dec. at 959, 961 (rejecting a proposed group of "noncriminal drug informants working against the Cali drug cartel" due, in part, to the fact that the distinction between government informants who had been compensated for their services and those who acted out of civic motives was not sufficient to carve out a particular "subgroup" of uncompensated informants).

### 3. The BIA has adequately distinguished social distinction and particularity

We had expressed concern in *Valdiviezo-Galdamez* that "social visibility" (now "social distinction") and "particularity" were really two ways of saying the same thing. 663 F.3d at 608. But the BIA has adequately articulated why it deems the ideas to be separate and why both are needed. In the BIA's reasoning, "social distinction" works to narrow the universe of "particular social groups" to those whose members are seen to be "distinct" or "other," like the distinctiveness inherent in the other enumerated grounds of race, religion, nationality, and political opinion, while "particularity" ensures that a group has "discrete … boundaries" capable of a common, accepted definition. *M-E-V-G-*, 26 I. & N. Dec. at 239-40, 244. We agree that particularity and social distinction address different aspects of whether an applicant has established a particular social group.[18] Although they may often involve similar evidence, which the BIA readily acknowledges, *id.* at 241, that alone is not a basis to reject them as being indistinguishable.

Some overlap is to be expected, given that each requirement is meant to illuminate whether a particular social group exists in the society in question. *See id.* ("[The requirements] overlap because the overall definition is applied in the fact-specific context of an applicant's claim for

---

[18] The Ninth Circuit has also concluded that the two requirements are sufficiently distinct. *See Reyes*, 842 F.3d at 1135-37 (discussing differences between social distinction and particularity).

relief."). But particularity and social distinction are different in an important respect: the former is essentially an objective inquiry, asking whether a reasonable person could look at the proposed definition of a social group and determine who falls within it, whereas the latter poses a more subjective question, whether the alien's home society actually does recognize that group as being a "distinct" and identifiable group. Inquiring separately about objective and subjective perspectives is a familiar task in the law[19] and is not out of bounds in this context. For example, "[t]he well-found fear of persecution standard involves both a subjectively genuine fear of persecution and an objectively reasonable possibility of persecution." *Valdiviezo-Galdamez*, 663 F.3d at 590-91. In short, we are satisfied that the BIA has explained why the two requirements are not really just the same thing done over.

The BIA has also explained why it views the addition of "social distinction" and "particularity" as necessary limitations on the *Acosta* test. It noted its concern that *Acosta*'s immutable characteristic requirement resulted in "confusion and a lack of consistency as adjudicators struggled with various possible social groups, some of which appeared to be created exclusively for asylum purposes." *M-E-V-G-*, 26 I. & N. Dec. at 231. The additional requirements of social

---

[19] *See generally Kyllo v. United States*, 533 U.S. 27, 33 (2001) (describing Fourth Amendment inquiry as involving "a subjective expectation of privacy that society recognizes as reasonable"); *United States v. Elonis*, 841 F.3d 589, 596 (3d Cir. 2016) (construing 18 U.S.C. § 875(c)'s prohibition on transmitting communications containing a threat to injure another as including "both a subjective and objective component"), *cert. denied* 138 S. Ct. 67 (2017).

distinction and particularity arose from the BIA's experience adjudicating prior cases and its desire to give further guidance. When, in *Valdiviezo-Galdamez*, we remanded for the Board to give a "principled reason" and explanation for the added requirements, we indeed hoped to receive what we asked for and did not intend to foreclose any additions to the original *Acosta* test. *Id.* at 608; *see also id.* at 612 (Hardiman, J., concurring) (stating that "remand is necessary so the Board can either choose between its reasonable new requirements and its older but equally reasonable precedents, or reconcile the two interpretations in a coherent way"); *cf. Negusie*, 555 U.S. at 525 (Scalia, J., and Alito, J., concurring) ("I would not agree to remand if I did not think that the [BIA] has the option of adhering to its decision. The majority appears to leave that question undecided[.]"). S.E.R.L. is thus mistaken in reading *Valdiviezo-Galdamez* as precluding the three-part test the BIA adopted in *M-E-V-G-*.

We are not alone in deferring to the BIA's better explained interpretation of "particular social group." Since we issued our decision in *Valdiviezo-Galdamez*, the majority of our sister circuits have applied the test from *M-E-V-G-*, including the First, Second, Fourth, Fifth, Sixth, Eighth, Tenth, and Eleventh Circuits.[20] Moreover, in *Reyes*, the

---

[20] *See Perez-Rabanales v. Sessions*, 881 F.3d 61, 66 (1st Cir. 2018) (applying BIA's interpretation in *M-E-V-G-* and rejecting proffered social group of "Guatemalan women who try to escape systemic and severe violence but who are unable to receive official protection"); *Pacas-Renderos v. Sessions*, 691 F. App'x 796, 804 (4th Cir. 2017) (applying criteria from *M-E-V-G-*); *Hernandez-De La Cruz v. Lynch*, 819 F.3d 784, 786-87 & n.1 (5th Cir. 2016) (endorsing BIA's

Ninth Circuit expressly endorsed the BIA's interpretation of "particular social group" and granted it *Chevron* deference. *See* 842 F.3d at 1135 (concluding that "particularity" and "social distinction" are reasonable requirements). The wide acceptance of the BIA's revised test from *M-E-V-G-*, and, in particular, the Ninth Circuit's analysis of the companion case, *W-G-R-*, constitute persuasive support for our conclusion today. *Cf. In re Grossman's Inc.*, 607 F.3d 114, 121 (3d Cir. 2010) (en banc) (explaining that the "widely held views [of other circuit courts] impel us to consider whether the reasoning applied by our colleagues elsewhere is persuasive"). Independent of *Chevron*, we are constrained to acknowledge again that our role in the process of construing the term "particular social group" is rightly limited. As the Supreme Court has noted, courts are neither policy-makers nor diplomats; we are ill-suited for those roles. *Negusie*, 555 U.S. at 516-17. Immigration policy properly resides with the elected branches of government.

And, of course, we are not operating independently of the rule in *Chevron*. *Fatin*, 12 F.3d at 1239. The *Chevron* doctrine of deference to federal agencies is open to question,

interpretation); *Zaldana Menijar v. Lynch*, 812 F.3d 491, 498-99 (6th Cir. 2015) (same); *Rodas-Orellana v. Holder*, 780 F.3d 982, 992 (10th Cir. 2015) (concluding that *M-E-V-G-* and *W-G-R-* are "consistent with [the court's] past interpretation of social visibility"); *Juarez Chilel v. Holder*, 779 F.3d 850, 855 (8th Cir. 2015) (endorsing BIA's interpretation); *Paloka v. Holder*, 762 F.3d 191, 195 (2d Cir. 2014) (granting the BIA's interpretation in *M-E-V-G-* *Chevron* deference); *Chavez v. Att'y Gen.*, 571 F. App'x 861, 864-65 (11th Cir. 2014) (applying criteria from *M-E-V-G-*).

*see Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring) ("*Chevron* and *Brand X* permit executive bureaucracies to swallow huge amounts of core judicial and legislative power and concentrate federal power in a way that seems more than a little difficult to square with the Constitution of the framers' design."), but it is the law, and it allows the BIA to change its statutory interpretation and still be entitled to full deference from Article III courts, *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework."). All that is required is that the agency provide a "reasoned explanation" for its interpretation. *Id.* at 1000. The BIA has done so here, and because the three-part test endorsed in *M-E-V-G-* is based on a "reasonable construction of the statute, whether or not it is the only possible interpretation or … the one [we] might think best," that test prevails.[21] *Holder v. Martinez Gutierrez*, 566 U.S. 583, 591 (2012).

---

[21] At the same time, we are mindful of the role that courts can and must play to ensure that agencies comply with their "obligation to render consistent opinions," *Chisholm v. Def. Logistics Agency*, 656 F.2d 42, 47 (3d Cir. 1981), including, as relevant here, review of BIA decisions for inconsistent application of *M-E-V-G*'s requirements to similarly situated petitioners, routine rejection of proposed PSGs without reasoned explanation, and the imposition of insurmountable evidentiary burdens that would render illusory the opportunity to establish a PSG. However, just as we will carefully examine cases on petition for review to guard against such dangers, we anticipate that the BIA will scrutinize the IJ decisions that come before it with those

### D. S.E.R.L. Has Not Established Membership in a Cognizable Particular Social Group

Having concluded that the BIA's interpretation is entitled to *Chevron* deference, we now consider S.E.R.L.'s claim that her proposed particular social group – immediate family members of Honduran women unable to leave a domestic relationship – nevertheless satisfies the test from *M-E-V-G-*. To prevail on her asylum and withholding of removal claims, S.E.R.L. bore the burden of both alleging a cognizable particular social group as well as establishing her membership in that group based on evidence of record. Although "[t]he BIA is not permitted simply to ignore or misconstrue evidence" in the record, *Espinosa-Cortez v. Att'y Gen.,* 607 F.3d 101, 114 (3d Cir. 2010), we may only reverse factual findings if we conclude that "the evidence 'compels' a different result." *Kang*, 611 F.3d at 164 (quoting *Elias-Zacarias,* 502 U.S. at 481). We agree with the BIA's conclusion that S.E.R.L. has not satisfied the social distinction requirement.

S.E.R.L. focuses on the legal aspect of our inquiry, arguing that her proposed social group must be cognizable because it comprises two groups that the BIA has already recognized as meeting the particularity and social distinction requirements: "women of a particular nationality who are trapped in abusive relationships," and "immediate family." (Reply Br. at 1.) She illustrates her argument by way of a Venn diagram, suggesting that her group constitutes a

considerations in mind and with an eye towards providing clear guidance and a coherent body of law in this area.

particular social group as a matter of logic. While her reasoning has some superficial appeal, it is flawed, and we reject it for two reasons.

First, and most fundamentally, it ignores the factual feature in determining whether a particular social group is cognizable. The BIA has repeatedly stated that the particular social group determination depends on the facts of the case at hand. *See Acosta*, 19 I. & N. Dec. at 233-34 ("The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis."); *accord Matter of L-E-A-*, 27 I. & N. Dec. 40, 42 (BIA 2017); *M-E-V-G-*, 26 I. & N. Dec. at 251. And that must naturally be so, once it is given that social distinction involves proof of societal views. What those views are and how they may differ from one society to another are questions of fact upon which the ultimate legal question of cognizability rests. Consequently, it does not follow that because the BIA has accepted that one society recognizes a particular group as distinct that all societies must be seen as recognizing such a group. Kinship, marital status, and domestic relationships can each be a defining characteristic of a particular social group, but that does not mean that adding two or more of those characteristics together necessarily establishes a cognizable particular social group. In fact, that kind of addition may well broaden, rather than narrow, a group such that the society in question would not recognize it as distinct. Thus, as a matter of logic, it is invalid to assert that proof in one context is proof in all contexts.

Second and closely related, the Board made an important factual distinction between this case and its prior decision in *Matter of A-R-C-G-*. S.E.R.L. relies heavily on

that decision, in which the Board considered a group consisting of married female victims of domestic violence. *Matter of A-R-C-G-*, 26 I. & N. Dec. 388, 390-95 (BIA 2014), *overruled by Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018). Importantly, however, *A-R-C-G-* was premised on "DHS's concession that a particular social group exist[ed]," based on "unrebutted evidence that Guatemala has a culture of 'machismo and family violence.'" *Id.* at 394 (citation omitted). And, as earlier noted, *see supra* n.15, *A-R-C-G-* has recently been abrogated by the Attorney General, who stated that it "caused confusion because it recognized an expansive new category of particular social groups based on private violence." *Matter of A-B-*, 27 I. & N. Dec. at 319.

Here, relying on *M-E-V-G-* and *A-R-C-G-*, the BIA concluded that S.E.R.L.'s proposed group failed, in part because she had not identified sufficient evidence that immediate family members of Honduran women unable to leave a domestic relationship are viewed as socially distinct within Honduran society.

S.E.R.L. argues that the Board's decision is indefensible, because the record parallels what was presented in *A-R-C-G-*. She points to evidence, including country reports documenting violence against Honduran women, Honduran laws enacted to protect women and victims of domestic abuse, and evidence suggesting that those laws are underenforced, as well as a Honduran initiative to combat violence against women. But that evidence does not compel the conclusion that S.E.R.L.'s broader proposed group, which encompasses family members of domestic abuse victims – including family members who are male or female, young or

41

old, and live with or apart from the victims – is socially distinct.

We do not read the BIA's opinion as, in effect, "ignor[ing] S.E.R.L.'s evidence of rampant violence against women and their families in Honduras." (Reply Br. at 17, 18.) To be sure, the record includes disturbing evidence of crime, gang-related violence, and general human rights abuses, including gender-based violence against women in Honduras. The Board, however, noted the lack of evidence in the record establishing that "members of [S.E.R.L.'s proposed] group would be perceived, considered, or recognized in Honduras as a distinct group[.]" (AR at 5.) Although arguing that the BIA should not be free to credit or ignore evidence or avoid analyzing precedent just by claiming that the issue before it is different, S.E.R.L. fails to direct us to anything in the record that the IJ or BIA has ignored and that would compel the conclusion that Honduran society perceives immediate family members of women who cannot leave domestic relationships as constituting a socially distinct group. Thus, even if such a group were still cognizable after the Attorney General's recent decision overruling *A-R-C-G-*, the argument for granting the petition for review in this case fails.

S.E.R.L.'s criticism of the BIA's analysis strikes at the heart of the Board's discretion to adopt additional requirements for identifying a particular social group and its ability to apply those requirements on a case-by-case basis. That criticism may or may not be valid but, in any event, should be directed to Congress. As the law stands now, the BIA has the discretion it exercised, and while it remains to be seen whether the application of those requirements proves

42

principled and consistent, what matters for our purposes is that they are capable of such application. *Martinez Gutierrez*, 566 U.S. at 591, 596. In light of the deference owed to the BIA's view of the INA, and after reviewing the record as a whole, we conclude that S.E.R.L. has not met her burden of showing that the evidence here compels the conclusion that her proposed social group is viewed in Honduras as being socially distinct.[22]

## III. CONCLUSION

For the reasons set forth, we will deny S.E.R.L.'s petition for review.[23]

---

[22] Because we agree that S.E.R.L. has not adduced sufficient evidence to establish the existence of her proposed particular social group, we do not reach any of the other bases for the BIA's denial of her application for asylum and withholding of removal, and her final argument suggesting that remand is required for the agency to address her well-founded fear of persecution by Juan Orellana is moot.

[23] S.E.R.L.'s outstanding motion to supplement the record will also be denied. That motion is premised on a motion to reopen proceedings before the BIA. The BIA denied her motion, and S.E.R.L. has not appealed that decision. Thus, her motion and the new evidence it discusses are not properly before us. *See Kamara v. Att'y Gen.*, 420 F.3d 202, 218 (3d Cir. 2005) (noting that we "must approve or reject the agency's action purely on the basis of the reasons offered by, and the record compiled before, the agency itself" (citation omitted)).